**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **GLENN GOODWIN, et al.,** | **CASE NO. 1:18-cv-01014** |
| **Plaintiffs,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **AMERICAN MARINE EXPRESS, INC., et al.,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendants.** | |

Pending before the Court is the Defendants'[1] Motion to Dismiss Count Six of the Amended Complaint filed on March 7, 2019 ("Defendants' Motion"). (Doc. No. 32.) Plaintiffs filed a Memorandum in Opposition on April 4, 2019 ("Plaintiffs' Opposition"). (Doc. No. 33.) Defendants did not file a reply or response to Plaintiff's Opposition. For the following reasons, Defendants' Motion is DENIED.

**I. Factual Background**

In their Amended Complaint (Doc. No. 30), Plaintiffs Glenn Goodwin and Ronald King allege, in relevant part, as follows. They were hired by Defendant American Marine Express, Inc. ("AMX")[2] as W-2 employee drivers, but were later approached by Defendant Cain with AMX to

---

[1] The Named Defendants are: American Marine Express, Inc. ("AMX"); Gurai Leasing Company, LLC ("Gurai Leasing"); Intermodal Facilities Group, Ltd. ("IFG"); Daniel Cain ("Cain"); Harjit S. Dhillon ("Dhillon"); Kuldip S. Gurai ("Gurai"); and Billy Lee Kyle ("Kyle"). As to each of the individual named defendants, Plaintiffs allege that they are doing business as and/or are the alter egos of AMX, Gurai Leasing, and/or IFG, "whose agents/ and/or employees/ and/or whose own independent acts and/or omissions and/or other misconduct caused or contributed to the injury to Plaintiffs." (Doc. No. 30 at ¶¶ 7-9, 11.)

[2] Plaintiffs allege that AMX is a common carrier based in Cleveland that provides intermodal drayage, local/regional cartage, and over the road trucking services, whose customers ship goods via tractor trailers operated by company-employed drivers, and/or what it characterizes as owner-operators, with dedicated leased units. (Doc. No. 30 at ¶¶ 22-24.) Per Plaintiffs, as part of their "fraudulent scheme," the individual Defendants direct AMX to transfer titles of semi-

alter their status from that of a company-employed driver, to that of an owner-operator in a lease-purchase program.[3] Plaintiffs, through Cain, were promised that: they would receive one hundred percent of each load that they delivered with the leased semi-truck cabs, minus certain agreed deductions, to include no-interest fixed truck payments, fixed escrow payments, and reasonable and necessary expenses for fuel, maintenance, repairs, etc.; they would acquire equity in the semi-truck cabs that they were purchasing through weekly deductions; if they entered into the lease-purchase program they would receive more lucrative opportunities, routes, and income from AMX; and at the conclusion of the lease-purchase, they would be able to parlay ownership of the semi-truck cabs to greater opportunity and wealth by being able to lease their cabs to multiple motor carriers.[4] Defendants, through Cain, promised a written contract relative to the lease/purchase agreement, but no documentation or written agreement was provided or presented to Plaintiffs by Defendants regarding the lease-purchase program or the terms thereof and no documentation was provided to them by Defendants as to the true costs and expenses of the lease-purchase agreement.[5] King had agreed to purchase Unit 214 for $3,500 and Goodwin had agreed to purchase Unit 155 for $20,000.[6] Defendants never intended to transfer title of the semi-truck cabs to them, and after all the deductions were taken from their pay, they received little or no compensation.[7] Plaintiffs never received titles

---

truck cabs that they intend to lease to owner-operators, like Plaintiffs, to Gurai Leasing through lease agreement(s) called "Independent Contractor Agreement[s]." (*Id.* at ¶¶ 33, 34.) According to Plaintiffs, AMX and Gurai Leasing—as directed and controlled by the individual Defendants—concealed from them the terms of the lease and/or purchase, misrepresented and concealed from them the party from whom they were leasing and/or purchasing the semi-truck cabs, and the relationship between AMX and Gurai Leasing. (*Id.* at ¶¶ 36-38.) Plaintiffs allege that they reasonably believed that they were driving for and purchasing trucks from AMX. (*Id.* at ¶¶ 54, 130.)

[3] (*Id.* at ¶¶ 48, 49, 124-25.)
[4] (*Id.* at ¶¶ 61-65, 137-41.)
[5] (*Id.* at ¶¶ 58, 59, 66, 134-35, 142.)
[6] (*Id.* at ¶¶ 117, 151.)
[7] (*Id.* at ¶¶ 67, 143.)

2

to the semi-truck cabs because when they objected to the "arbitrary and unfair treatment," Defendants terminated them.[8]

Defendants assert that the business arrangements that Plaintiffs allege they entered into with them do not fall within the definition of "business opportunity plan" set forth in R.C. § 1334.01(D), and therefore, Count VI of Plaintiffs' Amended Complaint, which alleges violations of § 1334.02 of the Ohio Business Opportunity Plan Act, must be dismissed.

## II. Standard of Review

Under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009). In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. Nat'l Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[8] (*Id.* at ¶¶ 109-13, 184-90.)

3

678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."'" *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

Section 1334.01 of the Ohio Business Opportunity Act provides, in relevant part, as follows:

(A) "Seller" means a person who sells or leases a business opportunity plan.

(B) "Purchaser" means a person to whom a business opportunity plan is sold or leased.

\*\*\*

(D) "Business opportunity plan" means an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services under all of the following conditions:

(1) The goods or services are supplied by the seller, a third person with whom the purchaser is required or advised to do business by the seller, or an affiliated person.

(2) The purchaser is required to make an initial payment greater than five hundred dollars, but less than one hundred thousand dollars, to the seller or an affiliated person to begin or maintain the business opportunity plan.

(3) The seller makes any of the following representations:

4

\*\*\*

    (c) That the purchaser can earn a profit in excess of the initial payment;

    (d) That there is a market for the goods or services.

Defendants assert that "[t]he factual allegations must demonstrate that the lease purchase program satisfies the statutory definition of a business opportunity plan," i.e., that "there was an agreement in which each plaintiff 'obtained the right to offer, sell or distribute goods or services' supplied by AMX and Gurai Leasing." (Doc. No. 32 at 7.) According to Defendants, when interpreting the language of R.C. § 1334.01(D), Ohio's rules or canons of statutory construction[9] apply so as to dictate the conclusion that because the Amended Complaint does not identify any goods or services that Plaintiffs obtained the right to sell, distribute, or offer, the lease purchase program does not qualify as a business opportunity plan. According to Defendants, the agreements Plaintiffs entered into with AMX and Gurai Leasing only gave each Plaintiff the right to purchase a single truck at an agreed price, nothing more; and could not, and did not, give Plaintiffs a right to offer, sell, or distribute any freight transportation services to shippers since "[a]uthority to offer or sell freight transportation services comes only from USDOT."[10]

Plaintiffs respond by asserting that Defendants' arrangement with Plaintiffs extended beyond the mere purchase of a truck and "necessarily included providing services in the form of transporting cargo for AMX in the leased trucks."[11] According to Plaintiffs, the Amended Complaint includes

---

[9] In Defendants' Motion, they rely upon the Ohio Supreme Court's decision in *Stolz v. J & B Steel Erectors, Inc.*, 146 Ohio St.3d 281, 382-84 (2016), to establish "the applicable canons of statutory construction." (Doc. No. 32 at 6.)
[10] (Doc. No. 32 at 7.)
[11] (Doc. No. 33 at 7.)

5

allegations sufficient to meet the three statutory requirements set forth under R.C. §§ 1334.01(D)(1) through (3).

As to the requirement set forth under R.C. § 1334.01(D)(1) that "[t]he . . . services are supplied by the seller," Plaintiffs argue that Defendants, as the "seller[s]," agreed to supply the Plaintiffs or "purchaser[s]" with the "method of operation" to provide the transportation of cargo or "services," by providing them with not only the semi-truck cabs financed through Defendants, but also the shippers needing drivers to deliver freight, and the authority to transport goods in interstate commerce under AMX's operating authority. In support of this argument, Plaintiffs cite to *Cook v. Emplrs. Overload Co.*, No. C-2-87-0079, 1987 U.S. Dist. LEXIS 17094 (S.D. Ohio Aug, 18, 1987), wherein the Court denied the defendant's Rule 12(b)(6) motion to dismiss count one of the complaint that alleged a violation of Ohio's Business Opportunity Act, based upon the argument that the franchise agreement at issue did not meet the statutory definition of a "business opportunity plan" because the defendant did not supply the service that the plaintiff gave to its customers, i.e., providing temporary employees. In *Cook*, the Court agreed with the plaintiff that franchises wherein the purchaser or franchisee is supplied with the tools and method of operation to produce a final product or service which is sold under the franchisor's trademark were meant to be included in the definition of "business opportunity plan." *Id.* at *4.

As to the requirement set forth under R.C. § 1334.01(D)(2), i.e., that "[t]he purchaser is required to make an initial payment greater than five hundred dollars, but less than one hundred thousand dollars, to the seller . . . to begin or maintain the business opportunity plan," Plaintiffs argue

6

that Plaintiff King's "initial payment"[12] of $3500 for his semi-truck cab, and Plaintiff Goodwin's "initial payment" of $20,000 for his semi-truck cab satisfy this requirement. As to the requirement set forth under R.C. § 1334.01(D)(3)(c), that "[t]he seller makes . . . the . . . representation[]: ***[t]hat the purchaser can earn a profit in excess of the initial payment," Plaintiffs assert that this requirement is satisfied since the Amended Complaint alleges that AMX promised Plaintiffs that they would be assigned more lucrative routes, that they would earn a profit in excess of their initial payments, that there was a lucrative market for these services, and that they would receive title to a semi-truck cab.

Acknowledging that there is an absence of case law in this District wherein the Business Opportunity Plan Act has been applied to lease-purchases like those alleged by Plaintiffs, Plaintiffs cite to two non-Ohio cases in support of their position. The first is *Tousley v. N. Am. Van Lines, Inc.*, 752 F.2d 96 (4th Cir. 1985). In that case, plaintiff Tousley ("Tousley") attended a seminar where oral representations and written materials were presented to him by defendant North American Van Lines, Inc.'s ("North American") recruiting representative. *Id.* at 99. There, North American offered to train Tousley as a truck driver, sell him a truck, finance his purchase of the truck, and dispatch him and his truck to places where he would pick up freight for transportation. *Id.* Tousley was told that he should earn gross income of $71,000 a year, and after subtracting the payments on his truck and other expenses, should net between $16,000 and $19,000 a year. *Id.* The day following the seminar, Tousley paid $400 in order to attend North American's training school, and after attending it, Tousley purchased a truck from North American and executed a contract and security agreement and then operated the truck for approximately two years hauling freight for North American, but realized

---

[12] The term "initial payment" is defined in relevant part as follows: "If an agreement sets forth a specific total sale price for purchase of a business opportunity plan, which is to be paid in one or more installments, 'initial payment' means the entire total sale price." R.C. §1334.01(G).

considerably less income than the amounts mentioned by the recruiting representative. *Id.* at 99-100. After terminating his relationship with North American and continuing to work as an independent trucker, Tousley's attempt to refinance the truck failed, and he then consented to the voluntary repossession of the tractor by North American. *Id.* at 100. Tousley sued North American asserting violations of the Business Opportunity Sales Act and common law fraud and the jury returned a verdict in his favor. *Id.* at 99-100.

On appeal, North American contended that its recruitment of Tousley and the subsequent execution of the agreements did not amount to a "business opportunity" under the South Carolina Business Opportunity Sales Act, which provided, in pertinent part, as follows:

> As used in this chapter "business opportunity" means the sale or lease of any products, equipment, supplies or services which are sold to the purchaser for the purpose of enabling the purchaser to start a business and in which the seller represents:
>
> \*\*\*
>
> (3) That he guarantees that the purchaser will derive income from the business opportunity which exceeds the price paid for the business opportunity; or . . .
>
> (4) That upon payment by the purchaser of a fee or sum of money which exceeds fifty dollars to the seller, the seller will provide a sales program or marketing program which will enable the purchaser to derive income from the business opportunity which exceeds the price paid for the business opportunity.

S.C. Code Ann. § 39-57-20 (Law. Co-op. Supp. 1983).

Noting that while North American did not dispute that there was a sale or lease as described in the Act, but only that none of the four alternative requirements were present, the court concluded that "[t]he question of whether North American violated subsection (3) or (4), however, was a factual issue properly submitted to the jury, and . . . conclude[d] that there was more than sufficient evidence

8

upon which the jury could have based the finding against North American." *Tousley*, 752 F.2d at 104.

The second case cited and relied upon by Plaintiffs is *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457 (D. Utah 2017). Therein, the plaintiffs alleged that two affiliated trucking companies, C.R. England, Inc. ("England") and Opportunity Leasing, Inc., developed a fraudulent plan to induce thousands of people to enroll in England's driver training schools by promising students the choice of eventual employment as a company driver or the ability to earn a desirable income driving as an independent contractor. *Id.* at 467. The plaintiffs contended that in reality company driver positions were largely unavailable, and students in the driver training schools were subjected to a misinformation campaign to convince them to lease trucks from the defendants and become independent contractor drivers affiliated with England. *Id.* Allegedly, students were persuaded to invest substantial sums of money to lease trucks from defendants and became independent contractor drivers, but many soon found they could not earn a living as they had been led to believe and were left debt-ridden. *Id.* The plaintiffs sought recovery from the defendants, in part, based upon alleged violations of the Utah Business Opportunity Disclosure Act, Utah Code Ann. § 13-15-1, which applies to "sellers" of "assisted marketing plans."[13] The term "assisted marketing plan" as used therein was defined to include "the sale or lease of any products, equipment, supplies, or services that are sold to the purchaser upon payment of an initial required consideration of $300 or more for the purpose of enabling the purchaser to start a business, and in which the seller represents: *** (iv) that upon payment by the purchaser of a fee or sum of money, which exceeds $300 to the seller, the seller

---

[13] Utah Code Ann. § 13-15-2.

9

will provide a sales program or marketing program that will enable the purchaser to derive income from the assisted marketing plan that exceeds the price paid for the marketing plan." The court denied the defendants' motion for summary judgment, explaining, in relevant part, as follows:

> Plaintiffs offered some evidence that England developed the Driving Opportunity to attract independent contractors, indicated that independent contractors would pay leasing and variable mileage costs in exchange for business from one particular client (England), and suggested that the Driving Opportunity was an affordable and potentially lucrative business opportunity. Because a reasonable jury could find Defendants' representations relating to the profitability of the Driving Opportunity met the statutory requirements, genuine issues of material fact preclude summary judgment.

*Roberts*, 318 F.R.D. at 497.

Defendants did not reply to Plaintiffs' Opposition. The Court finds that in Plaintiffs' Amended Complaint, Plaintiffs have pled sufficient facts to state a plausible or non-speculative claim for relief under the Ohio Business Opportunity Act, specifically facts that if proven, could demonstrate that the lease-purchase agreements qualify as "business opportunity plan[s]" as that term is defined and used in the Act.

## IV. Conclusion

For the reasons set forth above, Defendants' Motion is DENIED.

**IT IS SO ORDERED.**

Date: November 4, 2019

   *s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE