# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **GLENN GOODWIN, et al.,** | **CASE NO. 1:18-CV-01014** |
| **Plaintiffs,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **AMERICAN MARINE EXPRESS, INC., et al.,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendants.** | |

This matter comes before the Court upon the following motions of Plaintiffs Glenn Goodwin ("Goodwin") and Ronald King ("King") (collectively, "Plaintiffs") and Defendants American Marine Express, Inc., ("AMX"), Gurai Leasing Company, LLC ("GLC"), Intermodal Facilities Group, Ltd. ("IFG"), Daniel Cain ("Cain"), Harjit S. Dhillon ("Dhillon"), Kuldip S. Gurai ("Gurai"), and Billy Lee Kyle ("Kyle") (collectively, "Defendants"):  (1) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 61); (2) Omnibus Motion for Summary Judgment of All Defendants Except Gurai Leasing Company, LLC ("Defendants' Omnibus Motion for Summary Judgment") (Doc. No. 75); (3) Motion for Summary Judgment of Defendant Gurai Leasing Company, LLC ("GLC's Motion for Summary Judgment") (Doc. No. 76); (4) Defendants' Motion to Strike Affidavit and Expert Report of Heinz E. Ickert ("Motion to Strike Ickert Report") (Doc. No. 79); (5) Defendants' Motion to Strike Affidavit and Report of Edward Brady[1] ("Motion to Strike Brady Report") (Doc. No. 80);

---

[1] Defendants originally mistakenly identified Edward Brady as Ed Bradley.  (*See* Doc. No. 84 at 1.)

and (6) Plaintiffs' Motion to Exclude Testimony of Belinda Glavic Grassi ("Motion to Exclude Grassi Testimony") (Doc. No. 95).  All motions have been fully briefed.  (*See* Doc. Nos. 81, 84-90, 97, 98.)

For the following reasons, Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 61) is DENIED, Defendants' Omnibus Motion for Summary Judgment (Doc. No. 75) is GRANTED IN PART and DENIED IN PART, GLC's Motion for Summary Judgment (Doc. No. 76) is GRANTED IN PART and DENIED IN PART, Defendants' Motion to Strike Ickert Report (Doc. No. 79) is GRANTED IN PART and DENIED IN PART, Defendants' Motion to Strike Brady Report (Doc. No. 80) is GRANTED IN PART and DENIED IN PART, and Plaintiffs' Motion to Exclude Grassi Testimony (Doc. No. 95) is GRANTED IN PART and DENIED IN PART.

## I.   Background

### a.   Factual Background

#### i.   Formation and Operation of AMX, GLC, and IFG

In 1986, Harjit S. Dhillon ("Dhillon") obtained a commercial driver's license, purchased a truck, and began transporting freight as an owner-operator.  (Doc. No. 75-1 at ¶¶ 2-3.)  Owner-operators own their trucks and lease them, along with their services as a driver, to a motor carrier that has federal operating authority to move freight in interstate commerce for the motor carrier's customers.  (*Id.* at ¶ 4.)  An owner-operator typically works as a subcontractor of the carrier to deliver the freight.  (*Id.*)  To wit, Dhillon received an agreed amount from the motor carrier to which he leased his truck for each load that he delivered under the carrier's operating authority.  (*Id.*)  In contrast to an owner-operator, a fleet operator owns multiple trucks that are leased to a carrier.  (*Id.* at ¶ 8.)  Because a fleet operator can only drive one truck by him- or herself, a fleet operator pays others to drive the trucks owned by the fleet operator.  (*Id.*)

In January 2007, Dhillon formed his own motor carrier company, American Marine Express, Inc. ("AMX"), and became its sole shareholder.  (*Id.* at ¶ 22.)  Dhillon did not want to take part in the day-to-day operation of the company, however, and instead set it up to run without his daily supervision.  (*Id.* at ¶ 17.)  Dhillon hired salaried employees to manage AMX and its various departments, including Daniel Cain ("Cain") to serve as AMX's general manager, Billy Lee Kyle ("Kyle") (Cain's brother) to be in charge of dispatch, and Cathy Behringer ("Behringer") to be in charge of safety.  (*Id.* at ¶¶ 18, 24, 31.)  Cain reported to Dhillon, but Dhillon continued to drive his truck to deliver freight during the day.  (*Id.* at ¶¶ 17, 31.)  Shortly after its formation, AMX obtained the authority to operate as a motor carrier transporting goods for hire in interstate commerce and began leasing trucks from owner-operators and fleet operators to deliver freight for AMX's customers.  (*Id.* at ¶¶ 22, 28.)  Owners of the trucks provided drivers as part of the leases, but before being permitted to drive a truck under AMX's operating authority, the drivers had to be qualified by AMX's safety department as being fit to drive a commercial vehicle.  (*Id.* at ¶ 27.)  One of the owner-operators that leased his truck to AMX was Dhillon's brother-in-law, Kuldip Gurai ("Gurai").  (*Id.* at ¶¶ 9, 24.)

AMX provided fuel cards to the owners of the trucks that it leased that could be used to purchase fuel and receive preauthorized cash advances on the carrier's credit, which, according to AMX, is customary in the industry.  (*Id.* at ¶ 29.)  In exchange for the provision of trucks and drivers, AMX paid the owner-operators and fleet operators that leased trucks to it on a weekly basis and provided a settlement statement for each truck being leased.  (*Id.* at ¶ 28.)  Owner-operators and fleet operators received a mileage-based freight rate for loads delivered, as well as any applicable fuel surcharge.  (*Id.* at ¶ 25, 28.)  AMX used a standard rate chart that specified what the owner-operator

3

or fleet operator would be paid for moving a container, which was uniform for all owner-operators and fleet operators.  (*Id.* at ¶¶ 25, 26).  The weekly settlements provided by AMX showed the freight rate and fuel surcharge as payables and any fuel purchases or cash advances as deductions.  (*Id.* at ¶ 28.)  AMX then provided a check for the net amount to the owner-operator or fleet operator that owned the truck.  (*Id.*)  AMX also established its own fuel pump and maintenance and repair garage for its owner-operators and fleet operators to use.  (*Id.* at ¶¶ 24, 30.)

Within the year, AMX outgrew its original location.  (*Id.* at ¶ 32.)  As a result, in December 2007, at the advice of counsel, Dhillon formed a separate real estate holding company named Intermodal Facilities Group, Ltd. ("IFG") with Dhillon as its sole member.  (*Id.* at ¶ 33.)  IFG then leased a larger area of land, with the option to purchase it, and subleased it to AMX to serve as AMX's new location.  (*Id.*)

In AMX's early years, in addition to leasing trucks from owner-operators and fleet operators, AMX also purchased its own trucks and hired independent contractors to drive them to deliver freight.  (*Id.* at ¶ 34.)  In 2010, however, AMX made the decision to exclusively use owner-operators and fleet operators to move freight.  (*Id.* at ¶ 36.)  Because Dhillon did not want AMX to lose access to its trucks and drivers, Dhillon wanted to sell them to someone that was loyal to him.  (*Id.*)  Dhillon considered selling the trucks to his brother, Daljit Dhillon, but instead chose to sell them to his brother-in-law, Gurai.  (*Id.* at ¶ 37.)

Gurai then formed Gurai Leasing Company, LLC ("GLC") to purchase the trucks from AMX.  (*Id.*)  There is some dispute, however, regarding the circumstances of these transfers.  Defendants contend that GLC agreed to lease purchase the twelve trucks that AMX owned outright for $55,500 payable over thirty-six months, as memorialized in a lease purchase agreement from September 2010.

4

(*Id.* at ¶ 38, Ex. A-2.)  For the trucks that AMX owned that were subject to finance liens, Defendants assert that GLC agreed to make all of the remaining payments and that when the lien for a truck was removed from the title, AMX would endorse the title over to GLC.  (*Id.* at ¶ 39.)  In challenging this characterization of the transfers, Plaintiffs point out that Defendants failed to produce a single document evidencing any payments made by GLC to AMX for the acquisition of any trucks and that Dhillon initially testified that he did not enter into any formal arrangements with Gurai regarding the purchase of AMX's trucks.  (Doc. No. 72-1 at 87:12-22.)[2]

Nonetheless, it is undisputed that after agreeing to the transfer of the trucks, GLC and AMX entered into Independent Contactor Agreements for GLC to lease back to AMX each of the trucks GLC was purchasing.  (Doc. No. 75-1 at ¶ 40.)  In doing so, GLC became the largest fleet operator that leased trucks to AMX.  (Doc. No. 65-1 at 37:11-23.)  And while the numbers varied throughout the years, GLC eventually was leasing thirty to forty trucks to AMX, accounting for a large part of the eighty to ninety trucks total being driven under AMX's operating authority.  (Doc. No. 73-1 at 58:13-59:21.)  Under the leases to AMX, GLC was responsible for providing a qualified driver and maintaining its trucks in compliance with Department of Transportation ("DOT") regulations.  (Doc. No. 75-1 at ¶ 40.)  GLC also was responsible for paying all costs of operating the trucks, except for motor carrier public liability insurance that AMX provided.  (*Id.*)  However, AMX's mechanical and safety departments continued to monitor the condition of the trucks and fitness of the drivers provided by GLC.  (*Id.* at ¶ 45.)  In addition, managers of AMX's mechanical and safety departments had the authority to disqualify any driver deemed to be unsafe.  (*Id.*)

---

[2] Defendants contend that Dhillon's testimony in this regard only related to the trucks subject to finance liens, not the twelve trucks that AMX owned outright that were transferred under the September 2010 lease purchase agreement.  (Doc. No. 90 at 14.)

After forming GLC, Gurai continued to deliver freight each day as an owner-operator. (*See* Doc. No. 73-1 at 93:13-15.) In order to provide drivers for the other trucks that GLC leased to AMX, however, GLC hired what it deemed to be independent contractors. GLC offered to pay its drivers 40% of the freight rate it received from AMX, but did not pay drivers any percentage of the fuel surcharge it received from AMX. (Doc. No. 76-1 at ¶ 15.) GLC did not withhold any taxes for its drivers, and drivers had to register with Ohio's Bureau of Workers' Compensation as being self-employed. (*See id.* at ¶¶ 12, 29, 44.) GLC's drivers also had to complete IRS Form W-9s and were issued IRS Form 1099s for compensation received from GLC. (*Id.*) Upon hiring, drivers were assigned a truck and instructed to contact AMX dispatch for loads. (*Id.* at ¶ 23.) However, the drivers were free to set their own hours and could not be forced to accept a load. (*Id.* at ¶ 24.)

Gurai's wife, Parmjit Gurai ("Parmjit"), was put in charge of calculating what GLC owed its drivers each week. (*Id.* at ¶ 20.) Parmjit would review the AMX weekly settlement for each truck, add up the rates for each move, and multiply that by 40%. (*Id.*) She then wrote her calculations on the bottom of the settlement, which was distributed to drivers. (*Id.*) If a driver took a cash advance, the advance was also deducted from his pay. (*Id.*)

After operating for a while, GLC began to offer a lease purchase program to its drivers that would enable them to purchase the truck they were driving for GLC and become owner-operators. Gurai believed this would help him motivate and retain drivers and keep GLC's fleet fresh by selling its trucks as they became old. (*Id.* at ¶ 28.) The details regarding the lease purchase agreements that King and Goodwin later entered into are highly disputed. But, in general, the way the lease purchase program was supposed to work was that instead of receiving 40% of the freight revenue, drivers would be entitled to 100% of what AMX paid GLC each week, minus a $250 lease purchase payment.

6

(*Id.* at ¶ 32.)  The drivers would also become responsible for paying for truck maintenance and repairs.  (*Id.*)  Parmjit also was responsible for keeping track of the expenses for trucks that were being lease purchased and the current balance of the purchase price.  (*See id.* at ¶¶ 31, 49-55.)

In 2015, Dhillon ceased being the sole owner of AMX and IFG.  Specifically, Gurai and Cain became co-equal owners with Dhillon in AMX and IFG.  (Doc. No. 72-1 at 73:10-76:9.)  Gurai received his ownership interests as a result of an earlier loan that Gurai's father provided to Dhillon for approximately $200,000.  (*Id.* at 73:3-16.)  When Dhillon was unable to repay the loan, he gave Gurai an ownership interest in his companies instead to settle his debt.  (*Id.*; Doc. No. 73-1 at 30:16-34:23.)  Cain received his ownership based on an agreement with Dhillon when AMX was founded that within approximately five years, Cain could earn stock if he performed well in growing the company.  (Doc. No. 64-1 at 130:15-131:1.)  Starting in 2015, after Gurai and Cain became part-owners of AMX, Dhillon, Gurai, and Cain would meet on a weekly basis to discuss the business.  (Doc. No. 72-1 at 149:8-151:5.)  Several years later, Kyle also became a 10% owner of AMX, but not IFG, to prevent Kyle from leaving to start his own company.  (Doc. No. 72-1 at 76:10-17; Doc. No. 64-1 at 169:7-20.)  As result, the ownership of AMX changed to 30% each for Dhillon, Gurai, and Cain and 10% for Kyle.  (Doc. No. 64-1 at 169:21-23.)  Gurai remains the sole owner of GLC.

Although AMX and GLC are legally separate companies, there appears to have been a substantial amount of overlap in their operations.  For instance, since AMX's formation and prior to becoming a part owner, Gurai was a signatory on AMX's bank accounts.  (Doc. No. 61-88.)  In addition, AMX's general manager, Cain, is a signatory on GLC's bank accounts.  (Doc. Nos. 86-16, 86-17, 86-18.)  There are also numerous instances in which Cain and other AMX employees signed documents on behalf of GLC. (Doc. No. 61-39 at 9; Doc. Nos. 61-90, 61-91; Doc. No. 65-1 at 194:15-

196:25; Doc. No. 73-1 at 291:17-292:10.)  For example, AMX's safety manager, Behringer, signed a Gurai Leasing Truck & Equipment Policy that reminded GLC drivers of their responsibilities while operating a GLC truck and potential liability to GLC as a "Gurai Leasing LLC Representative."  (Doc. Nos. 61-90.)  Parmjit, Gurai's wife, who was responsible for keeping track of payments to GLC drivers, also worked in AMX's billing department.  (Doc. No. 63-1 at 15:7-9.)

Further, although it was GLC's responsibility under its leases with AMX to provide drivers for its trucks, Plaintiffs have submitted evidence that GLC relied entirely on AMX to find and hire drivers.  Specifically, AMX—not GLC—advertised to hire drivers.  (Doc. No. 73-1 at 167:22-24; Doc. No. 65-1 at 98:9-99:9.)  Drivers also applied at AMX's offices using application forms that identified AMX as the drivers' employer.  (Doc. No. 73-1 at 169:17-19; Doc. Nos. 61-52, 61-54, 61-98, 61-99, 61-100.)  As described by Gurai, "American Marine Express hires driver.  Then I need it, I got it."  (Doc. No. 73-1 at 169:25-170:1.)  Plaintiffs also assert that AMX employees explain how drivers are going to be paid.  (*See* Doc. No. 12-1 at 20:3-21:6.)

However, Defendants dispute Plaintiff's characterization of the hiring process.  They assert that AMX is involved because prior to being permitted to drive a truck under AMX's operating authority, drivers had to be qualified by AMX's safety department.  If a qualified driver did not own a truck, Behringer would reach out to one of AMX's fleet operators to see if they needed a driver.  (Doc. No. 65-1 at 35:6-37:10.)  GLC was always looking for drivers, and Behringer would often advise an applicant who did not own a truck that GLC needed a driver.  (*Id.* at 42:16-44:1.)  According to Defendants, the safety department did not discuss with the applicants what they would be paid as contract drivers for GLC.  (*Id.* at 112:6-13.)  Instead, Defendants contend Gurai talked with each driver to explain that GLC paid its drivers 40% of the freight revenue.  (Doc. No. 75-2 at ¶ 3.)

Finally, there is evidence that AMX played at least some role in the lease purchase program that GLC offered to its drivers.  For example, both King and Goodwin testified that they communicated with Cain regarding their lease purchases.  (Doc. No. 12-1 at 120:9-23, 193:19-194:4; Doc. No. 13-1 at 109:18-110:8.)  In addition, Parmjit was frequently assisted in tracking the balance of GLC drivers' lease purchases by an AMX employee, Anthia Olmeda ("Olmeda").  (Doc. No. 62-1 at 9:9-24.)  At the direction of Parmjit, Olmeda helped prepare settlement statements showing deductions and balances.  (*See e.g.*, *id.* at 57:3-60:12, 81:4-84:14.)  This occurred during the day while Olmeda was working for AMX.  (*Id.* at 62-1 at 60:6-25; Doc. No. 63-1 at 202:6-17.)  On at least one occasion, AMX also indicated directly on the settlement statement it provided to GLC that a fuel payment had been added to a driver's loan for his lease purchase.  (Doc. No. 86-29 at 3.)[3]

### ii.  King's Lease Purchase and Termination

The parties dispute whether King was an independent contractor or an employee and whether King worked for AMX or GLC.  Plaintiffs assert King was employed by AMX, while Defendants assert King was an independent contractor for GLC.  (Doc. No. 76 at 6; Doc. No. 86 at 28-32.)  However, it is undisputed that King began driving under AMX's operating authority in April 2011

---

[3] Defendants object to the use of many of the documents Plaintiffs rely on to oppose Defendants' Motions for Summary Judgment as not being properly authenticated, including the specific document cited above.  (Doc. No. 90 at 9.)  When assessing a motion for summary judgment, "the general rule is that unauthenticated documents must be disregarded." *Moore v. Baptist Mem'l Coll. of Health Sciences*, No. 08-2311 MA/P, 2010 WL 100551, at *6 (W.D. Tenn. Jan. 7, 2010).  However, courts have held that "[w]here a document is produced in discovery, 'there [is] sufficient circumstantial evidence to support its authenticity' at trial," such that the document may be considered on summary judgment even if not otherwise properly authenticated.  *Churches of Christ in Christian Union v. Evangelical Ben. Tr.*, No. C2-07-CV-1186, 2009 WL 2146095, at *5 (S.D. Ohio July 15, 2009) (quoting *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991)); *accord Moore*, 2010 WL 100551, at *6 ("[A]lthough Moore concedes that he failed to properly authenticate Exhibits E, F, and L, Baptist produced these exhibits in discovery as its own business records and does not challenge the authenticity of the documents.").  Because Defendants have not challenged the actual authenticity of any of the documents cited by Plaintiffs and only allege such documents were not technically properly authenticated, the Court will consider any documents containing bates numbers indicating that they were produced in discovery by Defendants.  Any documents without bates numbers or other indication that they have been produced in discovery by Defendants, however, will be excluded from the Court's consideration if not properly authenticated.  (*E.g.*, Doc. Nos. 86-30, 86-31.)

and that he was initially paid by GLC at the 40% freight rate that GLC pays what it deems to be independent contractors.  (Doc. No. 12-1 at 102:9-21, 113:15-14:12; Doc. No. 76-1 at ¶ 29.)  Before starting as a driver, King signed an IRS Form W-9 and obtained his own workers compensation insurance.  (Doc. No. 76-1 at ¶ 29, Exs. A-3, A-4.)  GLC did not withhold any taxes from his pay and reported the compensation paid to King on IRS Form 1099.  (*Id*. at Ex. A-5.)

It is undisputed that in August 2011, King entered into a verbal lease purchase agreement with GLC in order to purchase the truck he was driving, which was designated Unit 214.  (Doc. No. 12-1 at 132:13-133:22; Doc. No. 76-1 at ¶¶ 29-31.)  However, King also asserts his agreement was with AMX, as he claims that he initially spoke with Cain to negotiate the purchase of his truck.  (Doc. No. 12-1 at 120:9-23, 193:19-194:4.)  In contrast, Defendants assert that King's agreement was solely with GLC.  (Doc. No. 75 at 21.)  The parties also disagree over the purchase price that was agreed upon.  King contends the purchase price was $3,500, while Defendants assert it was $7,500, plus the cost of registration and highway use taxes.  (Doc. No. 12-1 at 120:9-17, 197:7-10; Doc. No. 76-1 at ¶ 31.)

The initial pay structure under the agreement was that King would be entitled to 100% of what AMX paid GLC each week for the loads that he delivered, less deductions for any expenses, such as repairs, and a $250 lease purchase payment.  (Doc. No. 76-1 at ¶ 32.)  The parties dispute, however, whether the payment of all expenses was a prerequisite to King obtaining title to the truck.  King asserts paying off all expenses owed was not necessary, while Defendants contend title would only transfer when the profit King's truck generated less all expenses equaled the purchase price.  (Doc. No. 76 at 11; Doc. No. 86 at 6-7.)  In effect, Defendants contend that all repair charges and expenses were to be added to the purchase price of the truck.

10

Soon after entering into the lease purchase agreement, the formula for calculating King's pay and the manner in which lease payments and expenses were deducted started to vary.  According to Defendants, it quickly became apparent that the lease purchase arrangement needed to be changed because there were weeks when after the $250 payment was deducted from the settlement, King would be paid very little money.  (Doc. No. 76-1 at ¶ 33.)  What resulted was an ad hoc arrangement where King would be paid the entire settlement GLC received from AMX, and GLC would only make deductions when there was a large weekly settlement.  (*Id.*; Doc. No. 12-1 at 117:18-118:2.)  In weeks where the AMX settlement amount was less than 40% of the freight rate, which occurred when there were large fuel purchases but little freight revenue, King would be paid 40% of the freight rate.  (Doc. No. 76-1 at ¶ 34.)

King stopped participating in the lease purchase program in March 2014 after the engine in Unit 214 overheated and had to be rebuilt.  (*Id.* at ¶ 38; Doc. No. 12-1 at 202:5-25.)  King was assigned a different GLC truck to drive under the normal 40% freight rate and remained at GLC until June 2014.  (Doc. No. 76-1 at ¶ 41.)

According to King, he ceased driving for GLC altogether in June 2014 after he got into an argument with AMX's head mechanic, Kenneth Carver ("Carver"), regarding King's failure to conduct a pre-trip inspection of the truck he was assigned to drive.  (Doc. No. 12-1 at 81:21-84:7.)  King testified that after he cussed Carver out, Carver told him he was fired and to leave the premises.  (*Id.* at 83:1-5.)  However, Cain remembered King's termination differently.  Cain testified that he informed King he could not continue to drive under AMX's operating authority after his girlfriend showed up at AMX with a gun and the police were called.  (Doc. No. 64-3 at 505:15-507:7.)

11

King later returned to get his personal belongings out of Unit 214, but was prevented from fully doing so by an AMX employee.  (Doc. No. 12-1 at 85:19-86:14.)  GLC then parted out the truck to be sold for scrap.  (Doc. No. 73-1 at 318:13-19.)  Following his termination, King also spoke with Parmjit about obtaining title to Unit 214.  (Doc. No. 12-1 at 215:7-216:3.)  Based upon King's calculations, he owed $3,500 for the truck, which he was prepared to pay. (*Id.*)  But Parmjit told him that he owed $11,000, and he could not afford that.  (*Id.*)  However, the parties agree that Parmjit's record keeping with respect to King's lease purchase payments was not accurate.  Consequently, Plaintiffs and Defendants both hired experts to review King's settlement statements and other materials to determine whether King was paid what he was owed under the agreement and whether he had paid off his truck such that it should have been transferred to him.

According to Plaintiffs' expert, Heinz Ickert ("Ickert"), from 2011 to 2014, King's settlement payments were reduced by a total of $113,004, including $21,870 for truck payments, $86,223 for fuel, $2,331 for repairs, and $1,485 for plates. (Doc. No. 61-86 at 9, Ex. 2.)  He also concluded that King had paid off the purchase price of Unit 214, as well as all expenses, and was in fact overcharged by a total of $21,275.01.  (*Id.* at Ex. 14.)  In contrast, Defendants' expert, Belinda Glavic Grassi ("Grassi"), concluded that King had not earned any credit toward the purchase of Unit 214.  Instead, she concluded that he actually owed $247.19 when all of the payments made to King via check or cash advance and all of the expenses attributed to his truck were deducted from the revenue he produced.  (Doc. No. 76-2 at 8.)

Throughout King's time with AMX and GLC, King also asserts that he was subject to harassment based on his race.  For instance, King testified that Cain told him that he would be fired if he voted for Barack Obama.  (Doc. No. 12-1 at 242:13-243:11.)  However, King admitted that Cain

12

might have been joking and that King was not disciplined in any way when Cain found out that he had voted.  (*Id.*)  King also described three instances in which AMX employees referred to King using racial slurs.  First, King stated that Kyle told him that Behringer had made comments regarding dumb nigger truck drivers, although King admitted he never personally heard Behringer make these comments.  (*Id.* at 237:25-238:8.)  Second, at a Christmas party in 2012, an unknown individual called King a nigger.  (*Id.* at 240:25-241:15.)  According to King, he reported this to Cain, and King assumes the individual was fired because he never saw him again.  (*Id.* at 241:16-20.)  Finally, an AMX mechanic called King "a redneck nigger wanna be."  (*Id.* at 241:21-25.)  King stated that Cain refused to fire the mechanic, but that King and the mechanic never spoke again.  (*Id.* at 242:1-12.)

### iii.  Goodwin's Lease Purchase and Termination

Again, the parties dispute whether Goodwin was an independent contractor or an employee and whether Goodwin worked for AMX or GLC.  Plaintiffs assert Goodwin was employed by AMX, while Defendants assert Goodwin was hired as an independent contractor for GLC.  (Doc. No. 76 at 7; Doc. No. 86 at 28-32.)  Regardless, it is undisputed that Goodwin began driving under AMX's operating authority in August 2012 and that he was initially paid by GLC at the 40% freight rate that GLC pays its drivers.  (Doc. No. 13-1 at 47:1-4, 51:20-23, 66:21-22; Doc. No. 76-1 at ¶¶ 44-46.)  Like King, Goodwin signed an IRS Form W-9 attesting that he was a sole proprietor and registered as an employer with workers compensation.  (Doc. No. 76-1 at ¶ 44.)  GLC also reported the compensation paid to Goodwin on IRS Form 1099.  (*Id.*)

It is undisputed that in December 2013, Goodwin entered into a verbal lease purchase agreement with GLC in order to purchase the truck he was driving, which was designated as Unit 155.  (Doc. No. 13-1 at 109:5-17; Doc. No. 76-1 at ¶¶ 46-49.)  However, Goodwin asserts his

13

agreement was also with AMX, as he claims that he initially negotiated the purchase of his truck with Cain.  (*Id.* at 109:18-110:8.)  In contrast, Defendants assert that Goodwin's agreement was solely with GLC.  (Doc. No. 75 at 21.)  The parties also disagree over the purchase price that was agreed upon.  Goodwin contends the purchase price was $23,000, while Defendants maintain the only written record of the purchase price are the handwritten notes on the settlement for the week ending January 5, 2014 that showed that after four weeks, the remaining balance on the truck was $29,000 and there was $400 in Goodwin's escrow account.  (Doc. No. 13-1 at 124:7-125:1; Doc. No. 76-1 at ¶ 49, Ex. A-13.)

The initial pay structure under the agreement was similar to King's agreement, meaning that Goodwin would be entitled to 100% of what AMX paid GLC each week for the loads that he delivered, less deductions for any expenses, such as repairs, and a $250 lease purchase payment. (Doc. No. 13-1 at 149:10-15, 115:2-6; Doc. No. 76-1 at ¶ 47.)  The only difference was that a $100 escrow payment also would be deducted on a weekly basis to pay for anticipated future repairs. (Doc. No. 13-1 at 115:7-17; Doc. No. 76-1 at ¶ 47.)   Again, however, the parties dispute whether the payment of all expenses was a prerequisite to Goodwin obtaining title to the truck.  Goodwin testified that he never agreed to have repairs added to his purchase price.  (Doc. No. 13-1 at 196:25-197:3.) Gurai also admitted during his deposition that he never discussed with the Goodwin the fact that he had to pay the repair balance before obtaining title to his truck.  (Doc. No. 73-1 at 314:12-22.) However, Defendants assert Goodwin had to pay off both the expenses and purchase price to obtain ownership of the truck.  (Doc. No. 76 at 11.)

Defendants assert this pay structure was altered at Goodwin's request shortly after entering into the lease purchase agreement.  Specifically, Defendants assert that Goodwin made more money

14

as a lease purchaser each week until a week in March 2014 in which he only received $12.51.  (Doc. No. 76-1 at ¶ 50.)  Goodwin was not happy, so Gurai changed how the lease purchase program worked for Goodwin.  (*Id.* at ¶ 51.)  Going forward Goodwin would be paid 40% of the freight revenue and Parmjit would credit the remaining amount from the AMX settlement to either truck expenses or the purchase price. (*Id.* at ¶¶ 51, 52.)

Goodwin stopped driving for GLC in April 2017.  (*Id.* at ¶ 56.)  After several incidents—including a complaint regarding Goodwin's aggressive driving in which he was speeding on the highway, the failure to properly zip tie the container on the chassis on his truck, and a container falling off its chassis—AMX safety director, Theresa Wilkins ("Wilkins"), determined that Goodwin posed an unsafe risk to the motoring public and called him into her office to advise him of her decision.  (Doc. No. 13-1 at 239:22-241:4, 242:7-243:25, 245:22-248:7.)  Goodwin became very aggressive and shoved everything off of Wilkins's desk.  (*Id.* at 245:22-248:7.)  The police were called and Goodwin left the property.  (*Id.*)

After his termination, none of Goodwin's escrow funds were returned to him.  (Doc. No. 73-1 at 275:14-18.)  Goodwin later came into some money and called Cain and Gurai about purchasing Unit 155.  (Doc. No. 13-1 at 249:22-250:8.)  Based upon Parmjit's records, the balance owed was $12,000.  (Doc. No. 76-1 at ¶ 57.)  Gurai informed Goodwin of this, but did not hear back from him after that.  (*Id.* at ¶ 58.)

Again, however, the parties agree that Parmjit's records keeping track of the lease purchase payments were not accurate, and each expert also attempted to calculate whether Goodwin was paid what he was owed under the agreement and whether he had paid off his truck such that it should have been transferred to him.  According to Plaintiffs' expert, from 2014 to 2017, Goodwin's settlement

payments were reduced by a total of $193,960, including $35,661 for truck payments, $118,992 for fuel, $26,101 for repairs, $8,066 for escrow, and $4,600 for plates.  (Doc. No. 61-86 at 9, Ex. 1.)  He also concluded that Goodwin had paid off the purchase price of the truck, as well as all expenses, and was overcharged by a total of $25,653.35.  (*Id.* at Ex. 14.)  In contrast, Defendants' expert concluded that Goodwin had only earned $9,241.57 in credit towards the purchase of Unit 155 when all of the payments made to Goodwin via check or cash advance and all of the expenses attributed to his truck were deducted from the revenue he produced.  (Doc. No. 76-2 at 6.)

### b.  Procedural History[4]

On May 2, 2018, Defendants removed the instant matter to this Court from state court.  (Doc. No. 1.)  On February 22, 2019, Plaintiffs filed an Amended Complaint, setting forth the following claims: breach of contract (Count One); unjust enrichment/quasi-contract (Count Two); promissory estoppel (Count Three); fraud/misrepresentation (Count Four); conversion (Count Five); violation of Ohio's Business Opportunity Plan Act (Count Six); unlawful discriminatory practices under Ohio law (Count Seven); unlawful discriminatory practices under Ohio law—termination (Count Eight); violation of the Ohio Minimum Fair Wage Standards Act ("OMFWSA")—discrimination (Count Nine); hostile work environment (Count Ten); violation of OMFWSA (Count Eleven); non-payment of wages (Count Twelve); violation of Ohio labor provisions pursuant to Ohio Revised Code ("O.R.C.") §§ 4113.18, 4113.19, and 4113.20 (Count Thirteen); violation of the Truth-in-Leasing regulations (Count Fourteen); violation of the Fair Labor Standards Act ("FLSA") (Count Fifteen). (Doc. No. 30.)

---

[4] This case has an extensive procedural history with which the parties are familiar.  The Court will describe that history only to the extent it is relevant to the parties' motions and to provide a brief background.

On May 12, 2020, Plaintiffs filed a Motion for Partial Summary Judgment, seeking summary judgment only with respect to Count Fourteen of their Amended Complaint against AMX and GLC. (Doc. No. 61.)  Several days later, on May 15, 2020, all Defendants, except for GLC, filed an Omnibus Motion for Summary Judgment, seeking summary judgment on all counts.  (Doc. No. 75.)  The same day, GLC filed its own Motion for Summary Judgment, also seeking judgment on all counts of Plaintiffs' Amended Complaint.  (Doc. No. 76.)  While briefing on the parties' respective motions for summary judgment was ongoing, Defendants also filed Motions to Strike the affidavits and reports submitted by each of Plaintiffs' experts.  (Doc. Nos. 79, 80.)  Finally, on December 30, 2020, Plaintiffs filed a Motion to Exclude the testimony of Defendants' expert.  (Doc. No. 95.)  All of the motions have been fully briefed.  (*See* Doc. Nos. 81, 84-90, 97, 98.)

## II.  Motions to Strike or Exclude Testimony

Prior to reaching the substantive arguments raised in the parties' respective motions for summary judgment, the Court will first address Defendants' Motion to Strike Ickert Report (Doc. No. 79), Defendants' Motion to Strike Brady Report (Doc. No. 80), and Plaintiffs' Motion to Exclude Grassi Testimony (Doc. No. 95).  *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions.").

As a threshold matter, the Court notes that a "motion to strike" applies only to pleadings.  *See* Fed. R. Civ. P. 12(f).  "Pleadings" are enumerated in Fed. R. Civ. P. 7(a), and the list does not include affidavits, briefs, or exhibits.  Therefore, a motion to strike is not the proper vehicle for attacking exhibits filed in support of, or in opposition to, motions for summary judgment.  *See Berry v. Citi Credit Bureau*, No. 2:18-cv-2654-SHL-dkv, 2020 WL 6440490, at *6 (W.D. Tenn. Mar. 30, 2020)

("Courts in this district have consistently held that a motion to strike is not the proper device for countering exhibits or affidavits attached to memoranda in support of motions."); *see also Loadman Grp., L.L.C. v. Banco Popular N. Am.*, No. 4:10cv1759LIO, 2013 WL 1154528, at *1 n.1 (N.D. Ohio Mar. 19, 2013).

Rather, in this context, "[m]otions to strike should be construed as objections under Rule 56(c)(2)" of the Federal Rules of Civil Procedure.  *Smith v. Interim HealthCare of Cincinnati, Inc.*, No. 1:10–cv–582, 2011 WL 6012971, at *4 (S.D. Ohio Dec. 2, 2011); Fed. R. Civ. P. 56(c) (2010 Advisory Committee Notes) (explaining that the Rule 56(c)(2) objection "functions much as an objection for trial, adjusted for the pretrial setting" and "[t]here is no need to make a separate motion to strike"); *see also Stillwagon v. City of Delaware*, 274 F. Supp. 3d 714, 737 (S.D. Ohio 2017) ("If a party does file a separate motion to strike, the motion should be construed as an objection under Rule 56(c)(2)."); *Berry*, 2020 WL 6440490, at *6; *Loadman Grp.*, 2013 WL 1154528, at *1 n.1.  If, in evaluating an objection under Rule 56(c)(2), a court is presented with inadmissible evidence, it "should disregard the evidence rather than striking it from the record."  *Berry*, 2020 WL 6440490, at *6.

Accordingly, and in light of the above, the Court will construe Defendants' Motions to Strike as objections under Fed. R. Civ. P. 56(c)(2).

### a.  Defendants' Motion to Strike Brady Report

In Defendants' Motion to Strike Brady Report, Defendants object to the affidavit and report of Plaintiffs' expert, Edward Brady ("Brady"), on the basis that his report contains only conclusory assertions about ultimate legal issues regarding the interpretation of the relevant Truth-in-Leasing regulations.  (Doc. No. 80.)  In response, Plaintiffs contend that Brady appropriately applied the

relevant factual evidence to the issues presented, that he was not required to provide a detailed explanation, and that expert testimony is not automatically precluded simply because it embraces an ultimate issue.  (Doc. No. 84.)  The Court finds that Defendants' objections have merit and will disregard Brady's affidavit and report when considering the parties' motions for summary judgment.

As explained by the Sixth Circuit:

> An expert opinion submitted in the context of a summary judgment motion " 'must be more than a conclusory assertion about ultimate legal issues.' "  *Id.* (quoting *Hayes v. Douglas Dynamics,* 8 F.3d 88, 92 (1st Cir.1993)); *see* FED. R. CIV. P. 56(e). Moreover, an expert opinion must "set forth facts" and, in doing so, outline a line of reasoning arising from a logical foundation.  *Am. Key Corp. v. Cole Nat'l Corp.,* 762 F.2d 1569, 1579–80 (11th Cir.1985).  Thus, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  *Mid–State Fertilizer Co. v. Exch. Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989) (citing *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 829–32 (D.C.Cir.1988)).

*Brainard*, 432 F.3d at 663-64.  Indeed, the Sixth Circuit "has repeatedly held that it is impermissible for a trial judge to delegate his duty to determine the law of a case to an expert."  *Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 919 (6th Cir. 1991).  Further, "[w]hile it is well established that a qualified expert in a civil case may offer his opinion on an 'ultimate issue' in a case, Fed. R. Evid. 704(a), experts 'may not testify to the legal implications of conduct' or 'tell the jury what result to reach.'"  *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128 (11th Cir. 2018) (quoting *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)).

In this case, Brady's report does little more than outline the relevant regulations and then make conclusory assertions regarding the legal implications of the parties' conduct.  For example, one of the main issues in this case, which is discussed at length below, is whether Plaintiffs were "owners" of their trucks under the Truth-in-Leasing regulations.   Under the Truth-in-Leasing regulations, an owner is defined as "[a] person (1) to whom title to equipment has been issued, or (2)

who, without title, has the right to exclusive use of equipment, or (3) who has lawful possession of equipment registered and licensed in any State in the name of that person."  49 C.F.R. § 376.2(d). After quoting this regulation and without additional explanation, Brady's opines in his report:

> i.    Mr. Glenn Goodwin had the right to exclusive use of Unit 155, the 2006 Freightliner with the VIN of 1FUJA6CK26LV99775.
>
> ii.   Mr. Ronald King had the right to exclusive use of Unit 214, the 1994 Freightliner with the VIN 2FUYDSYB7RA462851.
>
> iii.  Therefore, Mr. Goodwin and Mr. King were the owners of the equipment as defined above in 49 CFR Part 376.2 (2).

(Doc. No. 61-106 at 3-4.)  Similar legal conclusions are present throughout Brady's report.  (*See id.* at 4-6.)  Because these types of bare legal conclusions by an expert are improper for a judge to consider, the Court will exclude Brady's affidavit and report from its consideration.  Consequently, Defendants' Motion to Strike Brady Report is denied to the extent that it seeks to strike Brady's affidavit and report from the record, but granted to the extent that such materials will not be considered with respect to the parties' motions for summary judgment.[5]

### b.  Defendants' Motion to Strike Ickert Report

In their Motion to Strike Ickert Report, Defendants object to the affidavit and report of Plaintiffs' other expert, Heinz Ickert ("Ickert"), on the basis that in his report, (1) Ickert miscalculated what Goodwin and King owed GLC for repair expenses by using Parmjit's inaccurate accounting records, rather than the actual truck expenses GLC incurred; and (2) when comparing what Plaintiffs were actually paid with what they would have been paid had they been compensated pursuant to the

---

[5] To the extent that Plaintiffs request the opportunity to rectify any deficiency in Brady's report through a supplemental submission on summary judgment (Doc. No. 84 at 5), their request is denied.  *See Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001) (affirming decision not to afford the plaintiffs an opportunity to remedy deficiencies in the proffered expert testimony before granting summary judgment).

40% freight rate throughout their time as drivers, Ickert made several choices that caused him to underestimate the amount Plaintiffs were actually paid and overestimate the amount they would have been paid.  (Doc. No. 79.)  In opposition, Plaintiffs generally contend that Defendants' arguments go to the weight of the evidence, not its admissibility.  (Doc. No. 87.)  The Court finds that some of Defendants' objections are valid, but, as before, the Court declines to strike Ickert's report and will instead exclude certain portions of it from the Court's consideration.

"Under [Federal Rule of Evidence] 702, the trial judge acts as a gatekeeper to ensure that expert evidence is both reliable and relevant."  *Schall v. Suzuki Motor of Am., Inc.*, 449 F. Supp. 3d 689, 693 (W.D. Ky. 2020).  Specifically, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Interpreting Rule 702, the Sixth Circuit has explained:

> [A] proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements.  First, the witness must be qualified by "knowledge, skill, experience, training, or education."  Fed.R.Evid. 702.  Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id.*  Third, the testimony must be reliable. *Id.*  Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case."  *Id.*  In addition, *Daubert* provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony.  These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the

21

technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir.2001) (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786).  The test of reliability is "flexible," and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case.  *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167 (citing *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786).  Indeed, we have recognized that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir.2001).

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008).

As an initial matter, under this standard, the Court notes that several of Defendants' objections only pertain to the weight of Ickert's expert opinion, not its admissibility.  In *United States v. Javidan*, the government moved to exclude the expert testimony of a forensic accountant on the basis that he ignored certain underlying information or relied on summaries.   No. 11–cr–20052, 2013 WL 1563212, at *3 (E.D. Mich. Apr. 15, 2013).  The court denied the government's request, noting that the expert had disclosed the documents on which he relied and his processes, and holding that whether he "ignored certain information or did not include certain facts goes to the weight, and perhaps the credibility, of [the expert's] testimony," but "does not weigh against admissibility."  *Id.*; *see also Von Wiegen v. Shelter Mut. Ins. Co.*, No. 5:13–040–DCR, 2014 WL 66516, at *5 (E.D. Ky. Jan. 8, 2014) ("Mr. Cranfill relied upon standards applicable to his background as a forensic accountant while examining the documentation the plaintiffs' provided.  To the extent that the plaintiffs disagree with Mr. Cranfill's opinions and testimony or the facts he relies upon, those issues 'bear on the weight of the evidence rather than on its admissibility.'") (quoting *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)).

Similarly, here, Ickert is a forensic accountant that conducted a review of the accounting records produced by Defendants, including Plaintiffs' settlement statements, repair invoices related

to Plaintiffs' trucks, and fuel charges incurred by Plaintiffs from AMX.  (Doc. No. 61-86 at 4-5.)

Defendants argue that his affidavit and report should be excluded because he should have relied on

the actual truck expenses GLC incurred, rather than Parmjit's accounting records.  (Doc. No. 79 at 3-

4, 7.)  Defendants also object to certain aspects of Ickert's calculations with respect to his comparison

of what Plaintiffs would have been paid had they not entered into lease purchase agreements and what

they were actually paid.  For instance, for weeks in which information was missing, Defendants

criticize Ickert's decision to use an average of past payments to determine what Plaintiffs should have

been paid, but to enter zero for the amount that Plaintiffs were actually paid for the week.  (*Id.* at 5-

6, 8.)  All of these objections go to the weight of Ickert's opinion, not its admissibility.  Thus, the

Court will not exclude his report on these bases.

However, certain portions of Ickert's report should be excluded from the Court's

consideration on summary judgment because Plaintiffs have not shown that they are relevant to the

facts of the case.  As noted above, Rule 702 further requires that expert evidence or testimony "help

the trier of fact to understand the evidence or to determine a fact in issue."  "Expert testimony which

does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (citation omitted).  In addition, "nothing in

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence

that is connected to existing data only by the *ipse dixit* of the expert."  *General Elec. Co. v. Joiner*,

522 U.S. 136, 146 (1997).  Thus, "[e]xpert testimony that is not relevant, because it does not 'fit' the

facts of the case or fails to assist the trier of fact to understand the evidence, should likewise be

excluded under Fed. R. Evid. 702."  *Miami Valley Paper, LLC v. Lebbing Eng'g & Consulting*

*GMBH*, No. 1:05-CV-702-TSH, 2010 WL 11538131, at *4 (S.D. Ohio Jan. 22, 2010).

23

In this case, one of the purposes for which Plaintiffs engaged Ickert's services was "to determine the difference between the Plaintiff's actual earnings during their tenure with Defendants versus what they would have earned by continuing their initial employment status as Company drivers." (Doc. No. 61-86 at 6.)  Ickert uses the phrase "company driver" to refer to Plaintiffs' status prior to entering into their respective lease purchase agreements. (*Id.* at 5.)  To make this comparison, Ickert calculated what Plaintiffs would have been paid as company drivers by using 40% of both the freight rate and fuel surcharge generated by the truck. (Doc. No. 78-1 at 104:17-105:17.)  However, the evidence in this case, including testimony from Plaintiffs themselves, shows that the agreed rate of pay was 40% of the freight rate that GLC received from AMX for the deliveries that Plaintiffs made and did not include any percentage of the fuel surcharge. (Doc. No. 12-1 at 102:9-21, 113:15-114:12; Doc. No. 13-1 at 47:1-4; Doc. No. 76-1 at ¶ 15.)  Plaintiffs assert that there is a dispute of fact over this issue, but have not presented any evidence that they ever received, or should have received, 40% of both the freight rate and fuel surcharge when working as company drivers.  Instead, Plaintiffs cite to deposition testimony from Dhillon in which he states that AMX pays its owner-operators and fleet operators 70% of the freight rate and 100% of the fuel surcharge (Doc. No. 72-1 at 142:21-143:18), but this testimony is irrelevant to what Plaintiffs should have received when working as company drivers, as they were not owner-operators at that time.  Therefore, Ickert's calculation of what Plaintiffs should have received had they remained company drivers is not sufficiently tied to the facts of the case, and, in fact, contradicted by the available testimony. Therefore, the Court will not consider this portion of Ickert's report in ruling on the parties' motions for summary judgment.

24

Finally, the Court will also exclude from its consideration Ickert's calculation of Plaintiffs' outstanding repair balances when they ceased driving for AMX and GLC.  Defendants point out that in Ickert's report, he calculated the total repair charges for Goodwin's truck as $70,199.51, and the total amount of payments Goodwin made for repairs as $26,101.  (Doc. No. 61-86 at Exs. 1, 7.)  Yet, Ickert concluded that Goodwin had an ending balance with respect to repairs of only $15,135.41.  (*Id.* at Ex. 7.)  Similarly, Ickert calculated the total repair charges for King's truck as $21,609.64, and the total amount of payments King made for repairs as $2,331.  (*Id.* at Exs. 2, 7.)  Yet, Ickert concluded that King had an ending balance with respect to repairs of only $6,125.  (*Id.* at Ex. 7.)  When confronted with these discrepancies, Ickert could not explain how he arrived at the outstanding repair balances for either Plaintiff, admitting that he either owed Defendants' counsel an explanation for both numbers or needed to amend his report.  (Doc. No. 78-1 at 232:20-233:6.)  The Court is not aware that any explanation has been provided.  Without the ability to explain how he arrived at these amounts for Plaintiffs' ending repair balances, the Court deems Ickert's conclusions in this regard too unreliable and they will not be considered.  *See Rover Pipeline, LLC v. 10.55 Acres of Land, More or Less, in Ashland Cty., Ohio*, No. 5:17-CV-239, 2018 WL 4386024, at *12 (N.D. Ohio Sept. 14, 2018) (excluding expert testimony because the expert "was entirely unable to explain the basis for many of her figures and calculations").  In addition, any additional calculations based on these unreliable numbers also must be excluded, including Ickert's overall conclusion regarding whether Plaintiffs were overcharged by Defendants.

Accordingly, Defendants' Motion to Strike Ickert Report is denied to the extent that it seeks to strike Ickert's affidavit and report from the record, but granted to the extent that the portions of

Ickert's report identified above will be excluded from the Court's consideration on summary judgment.

### c. Plaintiffs' Motion to Exclude Grassi Testimony

In Plaintiffs' Motion to Exclude Grassi Testimony, they assert that the testimony of Defendants' expert, Belinda Glavic Grassi ("Grassi"), should be excluded because (1) Grassi is not qualified to reconstruct data from Defendants' accounting records, postulate as to the fairness of Plaintiffs' pay, or postulate as to the materiality of the missing data from Defendants' accounting records; (2) Grassi's analysis involved nothing more than simple math for which expert testimony is inappropriate; and (3) Grassi's testimony is not reliable because she relied on assumptions provided to her by Defendants' counsel, did not review certain relevant documents or ignored the information therein, lacked an understanding of the facts of the case, relied on certain assumptions that do not match the facts of the case, and included certain payments and deductions in her calculations that should not have been included.  (Doc. No. 95.)  In response, Defendants argue that Plaintiffs waived any objections to Grassi's report being considered on summary judgment by failing to timely object to it, that the excel spreadsheet and calculations prepared by Grassi are admissible under Federal Rule of Evidence 1006 as a summary of voluminous records, and that Grassi is qualified as an expert to render the opinions contained in her report.  (Doc. No. 97.)  The Court concludes that the majority of Plaintiffs' objections do not require the exclusion of Grassi's testimony, but the Court will grant Plaintiffs' Motion in part.

Initially, the Court finds that Plaintiffs did not waive their objections to the Court considering Grassi's affidavit and report when ruling on the parties' motions for summary judgment.  Plaintiffs' deposition of Grassi was originally scheduled to take place on March 25, 2020.  (Doc. No. 60.)

26

However, due to restrictions related to the COVID-19 pandemic, it had to be postponed, and the Court granted Plaintiffs' request for an extension of time to complete Grassi's deposition beyond the original expert discovery deadline.  Briefing on the parties' motions for summary judgment concluded on July 10, 2020, but Plaintiffs were apparently unable to complete Grassi's deposition until October 15, 2020.  (Doc. No. 93-1.)  Plaintiffs subsequently filed their Motion to Exclude Grassi Testimony on December 30, 2020.  (Doc. No. 95.)  Thus, while ordinarily the Court would consider Plaintiffs' Motion far too late, in light of the difficulties imposed by the COVID-19 pandemic and the resulting delay in Grassi's deposition, the Court will consider Plaintiffs' arguments.

Nonetheless, the Court finds several of Plaintiffs' objections meritless.  For instance, the Court finds unpersuasive Plaintiffs' arguments that Grassi is not qualified to render several of the opinions contained in her report.  First, Plaintiffs assert that because Grassi does not have any experience in forensic accounting, she is not qualified to reconstruct accounting records.  (Doc. No. 95 at 3-4.)  However, it is clear that Grassi did not actually include any information in her calculations that was not taken directly from a source document.  Instead, Grassi indicates in her report that "[i]f driver paperwork was missing for any period of time, the data was reconstructed (if possible) from carrier settlement sheets," but that "[i]f both driver paperwork and carrier settlement sheets were missing for any period of time, the data was considered unavailable for that period and omitted from the data totals."  (Doc. No. 76-2 at 4.)  Grassi similarly testified that if there was information missing from one source document that she could corroborate from another source document, she included it in her spreadsheet, but that if there was no corroborating data, she did not enter any data for that settlement period.  (Doc. No. 93-1 at 150:18-24.)  There is no indication that this type of analysis would require experience in forensic accounting or other specialization beyond Grassi's qualifications as a licensed

Certified Public Accountant ("CPA") of thirty-one years.  Second, Plaintiffs contend that Grassi was not qualified to conclude whether the missing data was material to her conclusions.  (Doc. No. 95 at 4.)  However, Grassi testified that it is common for CPAs to conduct analyses with limited information, and that her conclusion was based on the fact that a substantial amount of complete data was present.  (Doc. No. 93-1 at 147:7-149:2; *see also* Doc. No. 97 at 17 (quoting the American Institute of CPAs Auditing Standards' definition of material).  Finally, Plaintiffs contend that Grassi is not qualified to render an opinion as to whether Plaintiffs were paid fairly.  (Doc. No. 95 at 4-5.)  However, during her deposition, Grassi admitted that the statement in her report opining as to the fairness of Plaintiffs' pay was not meant to refer to how they were treated in terms of moral fairness, but only whether they were paid what they should have been paid under the terms of their service as she understood them.  (Doc. No. 93-1 at 167:1-168:20.)  Grassi never claimed to be qualified to opine as to the fairness of Plaintiffs' pay in terms of whether they were treated well or equitably.  Nonetheless, to the extent that was the intent of her statement, the Court will not consider it.  Beyond that, the Court will not exclude Grassi's other opinions discussed above at this time.

Plaintiffs also argue that Grassi's testimony should be excluded because her analysis involved nothing more than simple math for which expert testimony is inappropriate.  (Doc. No. 95 at 6-8.)  The Court declines to exclude Grassi's testimony on this basis, as the review and organization of a large number of financial documents has been held to assist the trier of fact to understand the evidence or to determine a fact in issue.  *See Javidan*, 2013 WL 1563212, at *2 (denying motion to exclude an expert's opinion because it was "based on simple financial documents," as "it is beyond explanation that the field of tax or accounting is sufficiently complex to be considered beyond the knowledge of the average person and would, therefore, aid the jury in understanding Acure's expenditures and

28

revenue"); *Gonzalez Prod. Sys., Inc. v. Martinrea Int'l Inc.*, No. 13-CV-11544, 2015 WL 4771096, at *11 (E.D. Mich. Aug. 13, 2015).

Next, Plaintiffs assert that Grassi's testimony should be excluded based on her reliance on assumptions provided by counsel, some of which Plaintiffs contend are contradicted by the evidence. (Doc. No. 95 at 9-13, 18-20.)  However, "[u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Williams v. Illinois*, 567 U.S. 50, 57 (2012).  "The fact that the expert uses 'assumptions provided by counsel,' for example, is immaterial."  *Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*, No. 1:12-cv-654, 2016 U.S. Dist. LEXIS 156782, at *8 (W.D. Mich. Jan. 28, 2016).  Rather, "an opinion may be based on facts that are 'assumed,' or 'hypothetical' at the time of the report, provided that those facts are ultimately 'established' by other, independent evidence." *Id.*; *see also Webasto Thermo & Comfort N. Am., Inc. v. Bestop, Inc.*, No. 16-CV-13456, 2019 WL 3334565, at *7 (E.D. Mich. July 25, 2019) ("It is clear that experts may permissibly rely on assumptions about underlying facts that are stated to them by the client.").

In this case, the main assumption behind Grassi's report was that drivers' could be paid under two scenarios: (1) a percentage of the freight paid from AMX to GLC; or (2) 100% of the payment from AMX to GLC, minus any operating costs for the truck.  (Doc. No. 76-2 at 3.)  These methods of payment are supported by the evidence presented on summary judgment.  Thus, there is no problem with Grassi conducting her analysis under these scenarios.  Plaintiffs take issue with the fact that Grassi assumed Plaintiffs did not have the right to purchase their trucks until all related expenses had been paid in full (Doc. No. 95 at 14-15), but this is a contested issue in the case.  Relatedly, Plaintiffs criticize Grassi's report for characterizing the lease purchase agreements as a way for Plaintiffs to

earn credits towards the purchase of their trucks (*id.* at 12-13), but this appears to simply be another way of expressing Defendants' contention that Plaintiffs had to pay off both the expenses and the purchase price before being entitled to ownership of their trucks.  Finally, the fact that Plaintiffs sometimes received payments that did not match either of the scenarios described above does not render Grassi's report inadmissible (*id.* at 18-20), as her report was meant to calculate what Plaintiffs *should have received* had they been paid in the manner that the parties agreed.  The fact that Plaintiffs occasionally received a different amount is not relevant to those calculations.  Accordingly, the assumptions relied on by Grassi in her report do not warrant excluding her testimony.

Plaintiffs make two additional arguments that the Court finds lack merit as well.  First, they argue that Grassi's report ignores certain documents that should have been included in her analysis. (Doc. No. 95 at 13-14, 16-17.)  As addressed above with respect to a similar argument that Defendants made to support the exclusion of Ickert's report, the Court finds that such argument goes to the weight of Grassi's opinion, not its admissibility.  *See Javidan*, 2013 WL 1563212, at *3; *Von Wiegen*, 2014 WL 66516, at *5.  Second, Plaintiffs attack Grassi's report for including certain payments and expenses in her calculations that should have been excluded as not relevant to Plaintiffs' lease purchases because they were not driving the trucks they were purchasing during the period for the settlement statements.  (Doc. No. 95 at 20-22.)  Again, such arguments are relevant to the weight of Grassi's testimony, not its admissibility.  *In re Yamaha Motor Corp. Rhino ATV Prod. Liab. Litig.*, 816 F. Supp. 2d 442, 462 (W.D. Ky. 2011) "[M]iscalculations and inaccuracies . . . go to the weight of the evidence and not its admissibility.") (citation omitted).

Finally, however, the Court finds one of Plaintiffs' objections has merit.  In their Motion, Plaintiffs assert that Grassi's report is unreliable because she relied on a summary of repairs to

determine the repair expenses related to Plaintiffs' trucks, rather than the actual repair invoices.  (Doc.

No. 95 at 23.)  During Grassi's deposition, she testified as follows:

> Q. Did you review any invoices for repairs that AMX billed to Gurai Leasing?
>
> A. I had a list of repairs.
>
> Q. When you say you had "a list of repairs," what are you referring to?
>
> A. Repairs for -- indicated on Mr. Goodwin's settlement statements.  And for Mr. King, there was some additional documentation, perhaps a schedule that was provided that actually did have some information on repairs.
>
> Q. When you say you had a schedule of repairs, do you know what you're referring to?
>
> A. It may have been a sheet that had some data on it that had repair information; but, again, that was all returned to Mr. Manos.
>
> Q. Do you know who prepared that summary?
>
> A. I do not.
>
> Q. Do you know why that summary wasn't identified in your report as some of the data that you reviewed?
>
> A. I do not.

(Doc. No. 93-1 at 27:3-23.)  This summary also was not produced in discovery.  (Doc. No. 95 at 13

n.12.)  Defendants do not respond to Plaintiffs' argument in this regard, except to assert that "[t]he

maintenance and repair expenses were taken from the AMX repair invoices and entered for the week

that the invoice was issued."  (Doc. No. 97 at 13.)  However, Defendants provide no citation to the

record in support of this statement.  In addition, Grassi's report does not indicate that she reviewed

any repair invoices.  (*See* Doc. No. 76-2 at 1.)  Thus, it is unclear exactly what role this summary

played in Grassi's report or how exactly she calculated the repair expenses related to Plaintiffs' trucks.

As a result, the Court will exclude her calculations regarding repair expenses from its consideration

on summary judgment.  *See Orthofix Inc. v. Lemanski*, No. 13-11421, 2015 WL 12990115, at *3 (E.D. Mich. Sept. 29, 2015) ("O'Brien's reliance on Orthofix's monthly sales spreadsheets, without examination of or inquiry into any of the underlying documents, raises serious questions about the reliability of his opinion.").  Further, any additional calculations based on these numbers also must be excluded, including Grassi's overall conclusion regarding whether Plaintiffs produced enough revenue above expenses to purchase their trucks.

Accordingly, Plaintiffs' Motion to Exclude Grassi Testimony is granted to the extent that the portions of Grassi's report identified above will be excluded from the Court's consideration on summary judgment, and denied in all other respects.

### III.    Parties' Motions for Summary Judgment

#### a.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d

619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

"[O]n cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012) (quoting *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001)).

### b. Analysis

Before reaching the merits of the parties' arguments with respect to each count of Plaintiffs' Amended Complaint, the Court will first address Plaintiffs' arguments regarding whether Defendants may be held liable for the acts of other Defendants under a joint venture theory and whether the

33

individual Defendants may be held liable, either through the piercing of the corporate veil or because of their individual participation in tortious conduct.

### i.  Joint Venture

First, Plaintiffs argue that all Defendants were part of a joint venture, such that each of them should be deemed to be bound by the actions and representations of the others.  (Doc. No. 86 at 39-44.)  Conversely, Defendants assert that Plaintiff has failed to establish the required criteria for the finding of a joint venture.  (Doc. No. 75 at 16-21; Doc. No. 90 at 5-6.)  The Court finds that Plaintiffs have failed to establish a genuine issue of material fact regarding whether Defendants were part of a joint venture, and Defendants therefore cannot be held liable for the acts of their co-Defendants under such a theory.

"Under Ohio law, parties who have entered into a joint venture agreement are each 'liable for the negligent and tortious acts of the other members, pursuant to the venture, that result in injury to third persons.'"  *J&R Passmore, LLC v. Rice Drilling D, LLC*, No. 2:18-cv-1587, 2019 WL 6051112, at *3 (S.D. Ohio Nov. 15, 2019) (quoting *Hulett v. Am.'s Finest Serv. Co.*, No. 1:03CV2497, 2005 WL 2233261, at *12 (N.D. Ohio Sept. 14, 2005)).  According to the Supreme Court of Ohio, a joint business adventure "is an association of persons with intent, by way of contract, express or implied, to engage in the [sic] carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure."  *Ford v. McCue*, 163 Ohio St. 498, 504 (1955).  In other words, "[t]o establish a

34

joint venture, Plaintiffs must prove five things—1) there is a joint contract; 2) Defendants intended to form a joint venture; 3) there exists a 'community of interest and control, including contributions to the joint venture'; 4) Defendants have 'the mutual right to direct and control the purpose of the joint venture'; and 5) Defendants have agreed to share in the profits and the losses." *J&R Passmore*, 2019 WL 6051112, at *3 (quoting *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996)).

In support of their argument that Defendants were part of a joint venture, Plaintiffs point to a variety of connections and interactions between the various Defendants, but largely fail to directly address any of the elements noted above.  (*See* Doc. No. 86 at 42-44.)  Most notably, Plaintiffs do not identify any express or implied agreement between any Defendants to share in the profits and losses of the alleged joint venture.  (*Id.*)  Indeed, there is no evidence that AMX, GLC, or IFG—the entities formed by the individual Defendants to conduct their businesses—shared profits or losses. This is fatal to Plaintiffs' claim of a joint venture between Defendants.  *See Anchor*, 94 F.3d at 1024 ("For a joint venture to exist 'there *must* be a sharing of the profits *and* the losses jointly, not severally.") (quoting *L & H Leasing Co. v. Dutton*, 612 N.E.2d 787, 790 (Ohio Ct. App. 3d Dist. 1992)); *Siegel v. LifeCenter Organ Donor Network*, 969 N.E.2d 1271, 1279 (Ohio Ct. App. 1st Dist. 2011) ("Among other requirements, a joint venture does not exist unless the parties share in profits and losses and have an equal right to direct each others' conduct.").  Accordingly, the Court finds that Plaintiffs have failed to establish the existence of a joint venture.

### ii.  Piercing the Corporate Veil

Next, Plaintiffs assert that Defendants' actions warrant piercing the corporate veil, such that the individual Defendants should be held personally liable, and AMX, GLC, and IFG should be treated as a unit and held fully responsible for each other's actions.  (Doc. No. 86 at 44-47.)

Defendants argue that Plaintiffs have not presented sufficient evidence to warrant piercing the corporate veil with respect to any Defendant.  (Doc. No. 90 at 24-26.)  The Court agrees.[6]

"A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of the corporation." *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Companies, Inc.*, 67 Ohio St.3d 274, 287 (1993).  However, "the 'veil' of the corporation can be 'pierced' and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." *Id.*  Thus, under Ohio law, "the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Id.* at 289.

The first element of this standard "is a restatement of the alter-ego doctrine, which requires that plaintiff 'show that the individual and the corporation are fundamentally indistinguishable.'" *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005) (quoting *Belvedere*, 67 Ohio St.3d at 288).  "In deciding whether the company is an alter ego of the individual, Ohio courts consider such factors as: (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding

---

[6] The Court also finds that Defendants were not required to move for summary judgment with respect to this issue, as piercing the corporate veil is not an independent claim, and they are entitled to respond in their reply to issues raised in Plaintiffs' opposition to their Motions for Summary Judgment.  *See Wallace v. Shelly and Sands, Inc.*, No. 04 BE 11, 2005 WL 678526, at *7 (Ohio Ct. App. 7th Dist. Mar. 17, 2005) ("Piercing the corporate veil is not a claim, it is a remedy encompassed within a claim.") (citation omitted).

themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s)."  *Id.* (quoting *LeRoux's Billyle Supper Club v. Ma*, 602 N.E.2d 685, 689 (Ohio Ct. App. 6th Dist. 1991)). However, this list of factors is not exhaustive.  *Id.*

With respect to piercing the corporate veil of GLC to hold Gurai individually liable, Plaintiffs cannot satisfy this first element.  While "the existence of only a single shareholder can be a powerful indicator of that shareholder's exercising control so complete over the corporation that it 'had no separate mind, will or existence of its own,'" *id.* at 607, courts have held "that fact alone is insufficient to satisfy the first prong of the *Belvedere* test."  *Equitesa Equipos y Terrenos, SA v. Valley Enterprises of Ohio, LLC*, No. 1:10-CV-01555, 2011 WL 5374127, at *5 (N.D. Ohio Nov. 3, 2011).  In this case, the only evidence offered by Plaintiffs to support Gurai's individual liability is the fact that Gurai is the sole member of GLC.  (Doc. No. 86 at 46.)  By itself, this is insufficient to show that GLC was the alter ego of Gurai, and Plaintiffs' attempt to pierce the veil in this regard therefore fails.

Similarly, Plaintiffs have failed to establish that any individual Defendants so controlled IFG that piercing the corporate veil is warranted.  The only evidence potentially relevant to this inquiry offered by Plaintiffs is the fact that Dhillon, Cain, and Gurai are all guarantors on IFG's bank loans. (Doc. No. 86 at 46.)  The Court finds this insufficient to satisfy the first element required to pierce the corporate veil.

With respect to piercing the corporate veil of AMX, Plaintiffs offer slightly more evidence. Specifically, Plaintiffs point out that AMX does not engage in routine corporate formalities, such as meetings of the board of directors or shareholders, taking or keeping minutes, issuing share

certificates, or maintaining capital accounts.  (Doc. No. 86 at 45-46.)  They also contend that AMX funds and property are routinely diverted by the individual owners for their personal use.  (*Id.* at 46.) However, the evidence relied upon only shows that AMX provides Dhillon, Cain, Cain's wife (who is also an employee of AMX), and Kyle with company cars.  (Doc. No. 64-1 at 174:15-175:25.)  In addition, AMX provides Dhillon, Cain, and Kyle with cell phones, although it appears AMX also provides a cell phone to at least one other dispatch employee.  (Doc. No. 67-1 at 62:14-64:6; Doc. No. 72-1 at 89:13-17.)  Given the lack of any evidence that AMX was inadequately capitalized or insolvent, that Dhillon, Cain, or Kyle held themselves out as personally liable for AMX's obligations, or that the corporation was a mere facade for the operations of Dhillon, Cain, or Kye, the Court finds that Plaintiffs' evidence is insufficient to establish alter ego status.  *See Prasse Lumber & Material Co. v. Dietrich*, No. 38872, 1979 WL 210193, at *3 (Ohio Ct. App. 8th Dist. June 14, 1979) (noting that closely held corporations generally do not comply with corporate formalities as rigidly and that use of a company car is frequently provided as a fringe benefit to employees).

However, even assuming that Plaintiffs have satisfied the first element with respect to these three individual Defendants, they have not presented sufficient evidence of the second element.  "[T]o fulfill the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act."  *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 513 (2008).  As explained by the Supreme Court of Ohio, "[t]he second element is the requirement that the shareholder's control of the corporation proximately caused the plaintiff's injury or loss."  *Belvedere*, 67 Ohio St.3d at 288-89.

In this case, Dhillon was the sole shareholder of AMX until 2015, meaning that he was the sole shareholder the entire time that King drove under AMX's operating authority.  King has not pointed to any way in which Dhillon exercised his control of AMX during his time as a driver to commit fraud, an illegal act, or a similarly unlawful act.  To the contrary, Dhillon had little involvement in the day-to-day operation of AMX, and there is no evidence that he had any involvement in King's lease purchase agreement.  (*See* Doc. No. 75-1 at ¶ 31.)  With respect to Goodwin, Dhillon was also the sole shareholder at the time that Goodwin entered into his lease purchase agreement, and, again, there is no evidence that Dhillon had any involvement in that agreement.  Further, while Cain and Kyle later became shareholders, Goodwin has not identified how they exercised any control they had over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against Goodwin.  Thus, Plaintiffs assertion that AMX's corporate veil should be pierced must also be rejected.

Finally, Plaintiffs' attempt to treat AMX, GLC, and IFG as a single unit to hold each responsible for the acts of the others through a veil piercing theory also cannot succeed under Ohio law.  In *Minno v. Pro-Fab, Inc.*, the Supreme Court of Ohio held that "[a] corporation's veil may not be pierced in order to hold a second corporation liable for the corporate misdeeds of the first when the two corporations have common individual shareholders but neither corporation has any ownership interest in the other corporation."  121 Ohio St.3d 464, 468 (2009).  The court's rational for this rule was that "[d]espite the element of common shareholder identity, sister corporations are separate corporations and are unable to exercise control over each other in the manner that a controlling shareholder can."  *Id.*  Thus, although two corporations "have common individual shareholders and officers, are engaged in similar lines of work, and possess identical business addresses," the doctrine

of piercing the corporate veil is inapplicable if "neither corporation has an ownership interest in the other." *Id.*; *accord Parker v. Miller*, No. 2:16-cv-1143, 2018 WL 3743981, at \*5-6 (S.D. Ohio Aug. 7, 2018) (rejecting attempt to pierce the corporate veil between two entities despite the fact they both had identical shareholders in identical proportions, shared the same president and vice president, and had the same physical address).

In this case, it is undisputed that AMX, GLC, and IFG do not have any ownership interests in each other.  Consequently, despite the overlap in their shareholders, employees, and operations, Plaintiffs may not hold AMX, GLC, or IFG liable for the acts of each other under the doctrine of piercing the corporate veil.  Accordingly, the Court finds Plaintiffs have failed to establish a genuine dispute of material fact with respect to their attempt to pierce the corporate veil of AMX, GLC, or IFG.

### iii.  Individual Liability

Finally, Plaintiffs argue that even if the individual Defendants cannot be held liable through a joint venture theory or the piercing of the corporate veil, they may still be individually liable for any acts in which they personally participated.  (Doc. No. 86 at 47-50.)  Defendants do not respond to Plaintiffs' argument in this regard.

"A corporate officer or shareholder normally will not be held liable for the debts or acts of the corporate entity."  *Mohme v. Deaton*, No. CA2005-12-133, 2006 WL 3833923, at \*1 (Ohio Ct. App. 12th Dist. Dec. 28, 2006).  However, "a corporate officer can be held personally liable for tortious acts he or she has committed and, under such circumstances, a plaintiff need not pierce the corporate veil to hold individuals liable who have personally committed such acts."  *Id.* at \*2.  Ohio courts have applied this personal participation theory of liability to some statutory violations as well.  *See State*

*ex rel. Cordray v. Evergreen Land Dev., Ltd.*, Nos. 15 MA 0115, 15 MA 0116, 2016 WL 5408651, at *4-5 (Ohio Ct. App. 7th Dist. Sept. 27, 2016).

Thus, the Court agrees with Plaintiffs that there is the potential that individual Defendants may be held liable for certain tortious acts or statutory violations in which they personally participated. But because this requires an individualized inquiry for each Defendant under the particular claims at issue, the Court will address Plaintiffs' argument to the extent necessary in its analysis of each claim below.

### iv.  Count One

In Count One of their Amended Complaint, Plaintiffs allege that Defendants breached the terms of their lease purchase agreements. (Doc. No. 30 at ¶¶ 201-16.) All Defendants, except GLC, argue that they are entitled to summary judgment on Plaintiffs' breach of contract claims because none of them entered into a contractual relationship with Plaintiffs. (Doc. No. 75 at 21.) GLC asserts it is entitled to summary judgment because neither Plaintiff has established that they paid off all expenses and the purchase price of their trucks, so no breach has occurred. (Doc. No. 76 at 11-12.) Defendants also assert that Plaintiffs have not established any damages. (Doc. No. 90 at 16.) In opposition, Plaintiffs appear to argue that there are questions of fact as to whether Defendants made improper deductions to Plaintiffs' pay and whether Plaintiffs paid off the purchase price and were entitled to receive title to their trucks. (Doc. No. 86 at 12-14.) After reviewing the parties' arguments, the Court finds that genuine issues of material fact preclude summary judgment in favor of AMX and GLC, but that all other Defendants are entitled to summary judgment with respect to Plaintiffs' breach of contract claims.

41

Generally, in Ohio, to prove a breach of contract claim, a plaintiff must demonstrate that: "(1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Second Calvary Church of God in Christ v. Chomet*, No. 07CA009186, 2008 WL 834434, at *2 (Ohio Ct. App. 9th Dist. Mar. 31, 2008).

With respect to the first element, GLC does not dispute that it entered into an oral contract with each Plaintiff for the lease purchase of Plaintiffs' respective trucks. (*See* Doc. No. 76 at 11-12.) However, AMX asserts that the only party that King or Goodwin contracted with was GLC, while Plaintiffs assert it is unclear whether certain promises and representations were made on behalf of AMX. (Doc. No. 75 at 21; Doc. No. 86 at 12 n.12.) The Court agrees with Plaintiffs that a question of fact exists with respect to whether AMX was also a party to the lease purchase agreements.

In *B & J Jacobs Co. v. Ohio Air, Inc.*, an Ohio court of appeals addressed a similar situation to that present here, in which one defendant, Ohio Air, argued that the trial court erred by finding it liable on a series of contracts that it maintained were solely between the plaintiff and Ohio Air of Cincinnati. No. C–020264, 2003 WL 22103385, at *1 (Ohio Ct. App. 1st Dist. Sept. 12, 2003). While Ohio Air and Ohio Air of Cincinnati were legally separate entities, they both engaged in the supply of materials to sheet-metal contractors, had overlapping employees, and were both involved in the initial negotiation of the purchase orders at issue by the plaintiff. *Id.* And while Plaintiff sent all of its payments to Ohio Air of Cincinnati, it "maintained that it did so under the belief that payment to Ohio Air of Cincinnati also constituted payment to Ohio Air." *Id.* Before addressing the parties' arguments, the court noted that Ohio law recognizes contracts implied in fact, which "arise from the conduct of the parties, or circumstances surrounding the transaction, that make it clear that the parties have entered into a contractual relationship despite the absence of any formal agreement." *Id.* at *2.

42

The court then upheld the trial court's determination that both entities were jointly and several liable for the breached contracts, reasoning:

> We interpret the trial court's findings and conclusions as tantamount to a determination of a series of implied-in-fact contracts between Ohio Air and B & J. Clearly, there was no express contract between the two companies.  But we hold that there was competent, credible evidence to support the trial court's determination that Ohio Air was more than a stranger to the contract, and that it had become, in fact, a party to the contract, or series of contracts, by the tacit understanding of the parties.  As noted, the trial court found that the two companies, while separate legal entities, shared a common business purpose and operated at times as one company.  As the court stated, the lines of demarcation were often "blurred."  The court found that both suppliers were doing business with B & J.  While Ohio Air argues that there was no proof that it received any consideration since payment was relayed to Ohio Air of Cincinnati, there was a sufficient basis to conclude that the orders solicited by quotes from Ohio Air of Cincinnati were of more than incidental benefit to Ohio Air, if only in terms of name recognition, market presence, and sale of its catalogued products.

*Id.* at *3.

Here, the Court likewise finds sufficient evidence of a blurring of the lines between AMX's and GLC's operation—even though they are legally separate entities—and AMX's involvement in the lease purchases to conclude that a genuine dispute of material fact exists as to whether AMX also may be held liable as a party to Plaintiffs' contracts.  To wit, both Plaintiffs testified that they negotiated the purchase of their trucks with Cain, AMX's general manager.  (Doc. No. 12-1 at 120:9-23, 193:19-194:4; Doc. No. 13-1 at 109:18-110:8.)   There is also evidence that both Plaintiffs continued to contact Cain and other AMX employees when issues arose with their lease purchase agreements.  (*See* Doc. No. 12-1 at 194:2-4; Doc. No. 13-1 at 125:14-21.)  In addition, Parmjit was an employee in AMX's billing department, but was also responsible for tracking the balance on Plaintiffs' lease purchases.  (Doc. No. 63-1 at 15:7-9; Doc. No. 76-1 at ¶¶ 31, 49-55.)  In tracking those balances, Parmjit was often helped by another AMX employee as well.  (*See* Doc. No. 62-1 at 9:9-24, 57:3-60:12, 81:4-84:14.)  AMX also indirectly benefited from the contracts, as a large portion

of the deductions from Plaintiffs' pay went to reimburse GLC for fuel and repair expenses, both of which were provided by AMX.  Finally, the lines between AMX and GLC often were not clearly demarcated, as several officers were signatories on both companies' bank accounts and AMX employees signed documents on behalf of GLC numerous times.  All of this is sufficient to raise a question of fact with respect to whether Plaintiffs entered into a contract with AMX for the lease purchase of their respective trucks, in addition to GLC.

There is also a question of fact regarding whether AMX and GLC breached the contracts and whether Plaintiffs suffered any damages.  There is testimony that once Plaintiffs paid off the purchase price of their vehicles, they were entitled to receive the title to their respective trucks regardless of whether related expenses, such as fuel and maintenance costs, had been paid.  (*See* Doc. No. 13-1 at 196:25-197:3; Doc. No. 73-1 at 314:12-22.)  Plaintiffs' expert, Ickert, calculated that both King and Goodwin made truck payments that exceeded their original respective purchase prices.  (Doc. No. 61-86 at Exs. 1, 2.)  Thus, there is a genuine dispute over whether AMX and GLC breached their contracts by failing to transfer title of the trucks to King and Goodwin and whether they were overcharged for their trucks.  Consequently, genuine disputes of material fact preclude summary judgment in favor of either AMX or GLC.

Summary judgment is appropriate, however, with respect to all other Defendants.  There is no evidence that any Defendant besides AMX and GLC was a party to Plaintiffs' lease purchase agreements, and, as discussed above, Defendants cannot be held liable under a joint venture or veil piercing theory.  In addition, under the personal participation theory, a corporate officer only may "be held personally liable for tortious acts he or she has committed."  *Mohme*, 2006 WL 3833923, at 2.  "[I]t is well established in Ohio that it is not a tort to breach a contract."  *Ohio City Orthopedics,*

*Inc. v. Med. Billing & Receivables, Inc.*, No. 81930, 2003 WL 1869873, at *4 (Ohio Ct. App. 8th Dist. Apr. 10, 2003).  Thus, the individual Defendants are not subject to liability on Plaintiffs' breach of contract claims under this theory either.  *See Deitrick v. Am. Mortg. Sols., Inc.*, No. 05AP-154, 2007 WL 611589, at *4 (Ohio Ct. App. 10th Dist. Mar. 1, 2007).

Accordingly, Defendants' Motions for Summary Judgment with respect to Count One are denied as to AMX and GLC, and granted as to all other Defendants.

### v.  Count Two

In Count Two of their Amended Complaint, Plaintiffs set forth a claim for unjust enrichment. (Doc. No. 30 at ¶¶ 217-33.)  Defendants, excluding GLC, move for summary judgment with respect to Plaintiffs' unjust enrichment claims on the basis that there was no quasi-contractual relationship between them and Plaintiffs.  (Doc. No. 75 at 21.)  GLC asserts it is entitled to summary judgment because the doctrine of unjust enrichment is not applicable when an express contract exists.  (Doc. No. 76 at 12.)  AMX also asserts that because it has paid what it owes to GLC under the contracts between AMX and GLC, AMX cannot be held liable under a theory of unjust enrichment based on Plaintiffs' claim that they did not receive the proper compensation under their contracts with GLC. (Doc. No. 90 at 16-18.)  In response, Plaintiffs contend they are entitled to plead their quasi-contract and breach of contract claims in the alternative and that there is evidence that Plaintiffs provided benefits to several Defendants that have been unjustly retained.  (Doc. No. 86 at 15-17.)  For the reasons set forth below, the Court concludes that all Defendants are entitled to summary judgment on Plaintiffs' unjust enrichment claims.

A claim for unjust enrichment "arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain."  *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d

45

179, 183 (1984) (quoting *Hummel v. Hummel*, 133 Ohio St. 520, 525 (1938)).  To establish a claim

for unjust enrichment, a party "must demonstrate that (1) he conferred a benefit upon a defendant, (2)

the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under

circumstances where it would be unjust to do so without payment." *RG Long & Assocs., Inc. v. Kiley*,

No. CA2014–10–129, 2015 WL 3824365, at *2 (Ohio Ct. App. 12th Dist. June 22, 2015).

"[I]n the absence of fraud or bad faith, Ohio law prohibits recovery under a theory of unjust

enrichment where an express contract covers the same subject." *R.J. Wildner Contracting Co., Inc.*

*v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031, 1043 (N.D. Ohio 1996); *accord Champion*

*Contracting Const. Co. Inc. v. Valley City Post*, No. 03CA0092–M, 2004 WL 1459298, at *6 (Ohio

Ct. App. 9th Dist. June 30, 2004) ("The doctrine of unjust enrichment, however, is 'inapplicable if

an express agreement existed concerning the services for which compensation is sought; the

parameters of the agreement limit the parties' recovery in the absence of bad faith, fraud or

illegality.'") (quoting *Pawlus v. Bartrug*, 673 N.E.2d 188, 191 (Ohio Ct. App. 9th Dist. 1996)).[7]

Although the existence of an express contract that governs the same subject matter bars an

unjust enrichment claim, "where the existence of a contract is in dispute, [an] unjust enrichment claim

may be pled in the alternative to a breach of contract claim." *Right-Now Recycling, Inc. v. Ford*

*Motor Credit Co.*, No. 1:11-cv-364, 2014 U.S. Dist. LEXIS 182828, at *61 (S.D. Ohio Oct. 1, 2014).

However, even at the motion to dismiss stage, if the existence of the contract is not in dispute, courts

routinely dismiss unjust enrichment claims as precluded by the contract. *See, e.g., Pinkerton v. Gov't*

---

[7] Importantly, "[a]ny fraud or bad faith that negates the operation of this rule must occur in the formation of the contract." *Integrated Molding Concepts, Inc. v. Stopol Auctions*, No. 1:07 CV 2617, 2007 WL 3001385, at *6 (N.D. Ohio Oct. 11, 2007) (quoting *R.J. Wildner*, 913 F. Supp. at 1043).  As will be discussed below in conjunction with Plaintiffs' fraud claims, Plaintiffs have not presented sufficient evidence of fraud in the formation of their lease purchase agreements to survive summary judgment.

*Employees Ins. Co.*, No. 5:18-CV-1371, 2019 WL 1026227, at *7 (N.D. Ohio Mar. 4, 2019) ("In this case, no party disputes the existence of the underlying insurance contract governing the issues in this case. Because there is no question that an express written contract exists between Pinkerton and defendants covering the disputed UIM coverage, Ohio law precludes a claim for unjust enrichment."); *N. Cent. Elec. Coop., Inc. v. Linde, LLC*, No. 3:16-CV-1890, 2019 WL 460485, at *4 (N.D. Ohio Feb. 6, 2019) ("Because the parties do not dispute the existence of a contract, but only whether that contract was breached, North Central's unjust enrichment claim may not proceed."); *Amarado Oil Co. v. Davis*, No. 5:12CV627, 2013 WL 5234440, at *12 (N.D. Ohio Sept. 17, 2013) ("In sum, because Amarado agrees that a contract exists and has not pleaded a viable fraud in the inducement claim, Count 3 is dismissed.").

This case has progressed far past the pleadings stage, and GLC does not dispute that it entered into express contracts with Plaintiffs that govern the disputes at issue—namely, whether Plaintiffs were overcharged for their trucks and related expenses or entitled to receive title to their respective trucks. Thus, Plaintiffs' unjust enrichment claims against GLC are barred by the existence of these contracts.

On the other hand, AMX contends that it never entered into any contractual relationship with Plaintiffs. Therefore, it is appropriate for Plaintiffs to continue to assert claims for unjust enrichment against AMX in the alternative. Nonetheless, Plaintiffs' claims against AMX fail for a different reason. In *Cook v. Ohio Nat'l Life Ins. Co.*, the Sixth Circuit addressed an analogous situation in which Ohio National paid commissions to Triad for the sale of annuities, "who in turn paid commissions to plaintiff pursuant to a separate agreement between plaintiff and Triad." 961 F.3d 850, 852 (6th Cir. 2020). The Sixth Circuit rejected the plaintiff's unjust enrichment claim against

Ohio National because the plaintiff did not allege that he could not recover his commissions from Triad.  *Id.* at 859.  Likewise, here, because Plaintiffs are still able to recover from GLC based on any violation of their express contracts, Plaintiffs cannot also maintain an action for unjust enrichment against AMX.

With respect to the other Defendants, the Court notes that Plaintiffs have not presented any evidence or argument with respect to their unjust enrichment claim against IFG, which also is not liable under a joint venture or veil piercing theory.  Likewise, the individual Defendants are not liable under a joint venture or veil piercing theory, and cannot be held individually liable for actions taken as employees or corporate officers for unjust enrichment because, like a breach of contract claim, unjust enrichment is not tortious in nature.  *See Baatz v. Columbia Gas Transmission, LLC*, 295 F. Supp. 3d 776, 791 (N.D. Ohio 2018) ("[I]t is well-settled that claims for unjust enrichment sound in contract rather than tort.") (quoting *Dodson v. Maines*, No. S–11–012, 2012 WL 2061608, at *9 (Ohio Ct. App. 6th Dist. June 8, 2012).  Thus, IFG and the individual Defendants are entitled to summary judgment on Plaintiffs' unjust enrichment claims as well.

Accordingly, Defendants' Motions for Summary Judgment are granted with respect to Count Two of Plaintiffs' Amended Complaint.

### vi.  Count Three

In Count Three of their Amended Complaint, Plaintiffs set forth a claim for promissory estoppel.  (Doc. No. 30 at ¶¶ 234-44.)  Defendants, excluding GLC, move for summary judgment with respect to Plaintiffs' promissory estoppel claims on the basis that there was no quasi-contractual relationship between them and Plaintiffs.  (Doc. No. 75 at 21.)  GLC asserts it is entitled to summary judgment because the doctrine of promissory estoppel is not applicable when an express contract

48

exists.  (Doc. No. 76 at 12.)  In opposition, Plaintiffs do not address their promissory estoppel claims,

except noting the standard for promissory estoppel in a single footnote.  (Doc. No. 86 at 15 n.18.)

"To demonstrate promissory estoppel, a claimant must show the following elements: a promise, clear

and unambiguous in its terms; reasonable and foreseeable reliance; and injury resulting from the

reliance." *Nilavar v. Osborn*, 711 N.E.2d 726, 736 (Ohio Ct. App. 2d Dist. 1998).  Because Plaintiffs

have failed to address this claim or identify evidence supporting each of these elements, the Court

finds that summary judgment in favor of all Defendants is warranted.  Accordingly, Defendants'

Motions for Summary Judgment are granted with respect to Count Three of Plaintiffs' Amended

Complaint.

### vii.  Count Four

In Count Four of their Amended Complaint, Plaintiffs set forth claims for fraud.  (Doc. No.

30 at ¶¶ 245-64.)  Defendants assert they are entitled to summary judgment on Plaintiffs' fraud claims

for a variety of reasons.   Specifically, Defendants contend Plaintiffs' claims are based on

representations regarding future performance that cannot support fraud claims, Plaintiffs cannot show

damages separate from their breach of contract claim, Defendants did not withhold any information

from Plaintiffs that they had a duty to disclose, and that there is no evidence that Parmjit or the other

Defendants were aware of the inaccuracy in her accounting records.  (Doc. No. 75 at 22-25; Doc. No.

76 at 13-14; Doc. No. 90 at 18-20.)  Plaintiffs assert their claims are not based on future promises,

but on Defendants' intent never to transfer title of the trucks, as well as additional misrepresentations

made by Defendants in the inaccurate settlement statements and Defendants' nondisclosure of the

Truth-in-Leasing regulation requirements and the true identity of the entity with which Plaintiffs were

49

contracting.  (Doc. No. 86 at 17-22.)  The Court concludes that all Defendants, except AMX, are entitled to summary judgment on Plaintiffs' fraud claims.

In Ohio, "[t]he elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55 (1987).

First, the Court finds that Plaintiffs have not identified sufficient evidence to establish a genuine issue of fact as to whether Defendants never intended to transfer title to Plaintiffs at the time they entered into the lease purchase agreements.  "The general rule is that fraud cannot be predicated upon a representation concerning a future event," as "[m]ere predictions about the future, expectations, or opinions are not fraudulent misrepresentations unless those opinions are fraudulently made." *Nilavar*, 711 N.E.2d at 739 (quoting *Link v. Leadworks Corp.*, 607 N.E.2d 1140, 1145 (Ohio Ct. App. 8th Dist. 1992)).  "Thus, a breach of promise ordinarily will not give rise to a claim of fraud because promises tend to invoke future activity."  *Id.*  "However, a promise made with a present intention not to perform it is a misrepresentation of an existing fact—the speaker's present state of mind."  *Id.* (quoting *Link*, 607 N.E.2d at 1145).  Consequently, "if a promissor intends at the time of his pledge not to act in accordance with it, his statements may constitute fraudulent misrepresentation."  *Id.*

50

However, "mere proof of nonperformance does not prove a lack of intent to perform."  *Wall v. Firelands Radiology, Inc.*, 666 N.E.2d 235, 243 (Ohio Ct. App. 6th Dist. 1995) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1186 (3d Cir. 1993).  As more fully explained:

> " '[F]raud cannot be predicated upon the mere fact that a promise has been broken * * *.  There must be evidence to justify a trier of fact in concluding that, when the promise was made, there was no intention of performing it * * *.  It would be as wrong morally as legally, as offensive to logic as to law, to hold that mere denial and nonperformance are evidence that, if a promise was made, it was made fraudulently * * *.  Bad, indeed, would be the case of the honest man who has made no such promise if, when falsely charged with it, he may not deny it without having his truth considered as some evidence either that there was such undertaking or that it was deceitfully made.' "  (Citations omitted.)  Accord *Murray v. Xerox Corp.* (C.A.2, 1987), 811 F.2d 118, 122.

*Id.* (citation omitted); *accord Captiva, Inc. v. Viz Commcationns, Inc.*, 85 F. App'x 501, 508 (6th Cir. 2004).

Here, in support of their claim that Defendants never intended to honor their contracts, Plaintiffs rely entirely on Defendants actions after the lease purchase agreements were formed.  (*See* Doc. No. 86 at 18.)  Without more, this is not enough to support Plaintiffs' fraud claims in this regard.  Moreover, there is undisputed evidence that other drivers have obtained title to their trucks through similar lease purchase agreements with GLC.  (Doc. No. 12-1 at 210:17-21; Doc. No. 73-1 at 123:8-25.)  Thus, Plaintiffs have not established that the intent not to perform at the time of formation of the contract can support a fraud claim against any Defendant.

Next, the Court finds that Plaintiffs' fraud claims based on overcharges and inaccurate settlement statements fail against all Defendants, except AMX.  With respect to GLC, Plaintiffs' claims fail because they have failed to establish any damages distinct from their breach of contract claims.  "Where a plaintiff asserts a tort claim based on the same conduct that constitutes a breach of contract, the plaintiff must show fraud damages separate from those attributable to the breach of

51

contract." *MISC Berhard v. Advanced Polymer Coatings, Inc.*, No. 1:14 CV 1188, 2014 WL 5038001, at *2 (N.D. Ohio Oct. 8, 2014); *accord Med. Billing, Inc. v. Med. Mgmt. Sciences, Inc.*, 212 F.3d 332, 339 (6th Cir. 2000) (holding damages did not arise uniquely from fraud when the defendant failed to pay a bonus that the plaintiff was entitled to under the parties' contract because whether the defendant failed to pay the bonus "because it manipulated the numbers" or for any other reason, the plaintiff's damages still flowed from the breach of contract).  Here, alleged damages that arise from Plaintiffs' fraud claims related to false and misleading settlement statements are the same as any damages that may arise from their breach of contract claims against GLC.[8]  As such, GLC is entitled to summary judgment on Plaintiffs' fraud claims based on inaccurate or false accountings.

However, because the existence of a contract between AMX and Plaintiffs is disputed, and because there is no alleged contract between Plaintiffs and any of the other Defendants, fraud damages based on Plaintiffs' inaccurate settlement statements would not necessarily be redundant with respect to the other Defendants.  *See ONB Ridge Villa One, LLC v. Deep Bay Green Corp.*, No. 1:13-CV-415, 2014 WL 435010, at *2 (N.D. Ohio Feb. 4, 2014) ("Plaintiff has no breach of contract action against Defendant Snider personally, but rather only against Defendant Deep Bay Green Corporation.  Therefore, tort damages are not redundant and Ohio law does not preclude Plaintiff's fraud claims against Defendant Snider."); *Onyx Envtl. Svcs., LLC v. Maison*, 407 F. Supp. 2d 874, 877 (N.D. Ohio 2005) ("[T]he mere existence of a plaintiff's inchoate cause of action against one party for breach of contract does not foreclose an action in tort against another party.") (citation omitted).

---

[8] Plaintiffs include a single footnote asserting that fraud damages would be more extensive, but provide no authority or reasoning to support their contention in this regard.  (See Doc. No. 86 at 18 n.23.)

Nonetheless, Plaintiffs have not presented any evidence that any of the individual Defendants or IFG were involved in the creation of Plaintiffs' settlement statements such that they could be found liable for fraud.  To wit, it appears that IFG, Dhillon, and Kyle were not involved in any manner in Plaintiffs' lease purchase agreements.  Plaintiffs testified that they had their initial conversations about their lease purchases with Cain, but there is no evidence that Cain later took part in calculating their pay during the terms of their agreements.  Finally, with respect to Gurai, the evidence shows that he relied on Parmjit to track the balance on Plaintiffs' truck payments and expenses, and there is no evidence he was aware of any false charges being assessed to Plaintiffs.  Thus, IFG and the individual Defendants are also entitled to summary judgment with respect to this basis for Plaintiffs' fraud claims.

However, Plaintiffs' expert concluded that Plaintiffs were overcharged by AMX for fuel purchases.  Specifically, he opined that certain charges appeared on their settlement statements that were not reflected on corresponding invoice reports.  (Doc. No. 61-86 at 11-12.)  AMX has not responded to explain these discrepancies.  As a result, the Court finds that this evidence of the presentation of false charges for fuel by AMX is sufficient to establish a genuine issue of material fact with respect to Plaintiffs' claims of fraud against AMX.

Finally, the Court will address the last two bases for Plaintiffs' fraud claims—the nondisclosure of certain requirements under the Truth-in-Leasing regulations and the nondisclosure of the true entity from which Plaintiffs were lease purchasing their trucks.  The Court finds that each of these bases fail with respect to all Defendants.  First, there is no evidence that Defendants were aware that the requirements of the Truth-in-Leasing regulations may apply to their agreements with Plaintiffs under the somewhat unique circumstances of this case—discussed in detail below with

53

respect to Count Fourteen—which means Plaintiffs' claims based on this nondisclosure cannot succeed. *See Jarvis v. Gahm*, No. 93CA725, 1994 WL 380469, at *4 (Ohio Ct. App. 4th Dist. July 11, 1994) ("[K]nowledge of the defect is a necessary element to an action for fraudulent non-disclosure."). Second, Plaintiffs have not demonstrated any way in which they relied on or in which they were injured by any confusion over whether they entered into a contract with AMX or GLC. Consequently, this nondisclosure also is insufficient to support a claim for fraud.

Accordingly, all Defendants, except for AMX, are entitled to summary judgment with respect to Count Four of Plaintiffs' Amended Complaint.

### viii.   Count Five

In Count Five of Plaintiffs' Amended Complaint, they set forth claims for conversion based on a variety of acts by Defendants. (Doc. No. 30 at ¶¶ 265-70.) In their opposition to Defendants' Motions for Summary Judgment, Plaintiffs narrow their claims of conversion. Specifically, Goodwin asserts that Defendants converted his escrow funds when they failed to return them after his termination, and King asserts that Defendants converted improvements that he made to his truck when they refused to allow him to retrieve them after his termination. (Doc. No. 86 at 25-26.) Defendants assert Goodwin's claims fail because a fungible commodity such as cash is incapable of being converted and a conversion claim cannot be based on sums due or owing under a contract. (Doc. No. 76 at 14.) With respect to King, Defendants assert his claim cannot succeed because he failed to make a demand for the return of his property. (*Id.* at 14-15.) In response, Goodwin asserts that funds can be converted when specifically identifiable, such as here, and King contends that he was not required to make a demand, but did make a demand for the return of his property anyway. (Doc. No.

86 at 25-26.)  The Court finds that Defendants are entitled to summary judgment on Goodwin's conversion claim, but that King's conversion claim may proceed against AMX and GLC.

Under Ohio law, "the elements of conversion are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Gascho v. Global Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 700 (S.D. Ohio 2012).  "Where conversion is premised on the unlawful retention of property, the plaintiff must establish that (1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to deliver the property to its rightful owner." *Id.*

The Court finds that Goodwin's conversion claim fails for two reasons.  First, "the mere breach of a contract, even though it results in the loss of specific property, does not constitute conversion." *Frisbie Co. v. City of East Cleveland*, 98 Ohio St. 266, 277 (1918); *see also Younglove Const., LLC v. PSD Dev., LLC*, No. 3:08CV1447, 2010 WL 3515603, at *7 (N.D. Ohio Sept. 3, 2010) ("Younglove's conversion claim essentially seeks damages for PSD's failure to pay the balance due under the contract, as the materials in question encompassed part of that contract and project. Younglove thus cannot transform its breach of contract claim to one for conversion.").  Here, Goodwin has not demonstrated how his claim for conversion based on Defendants' failure to return his escrow funds is distinct from his breach of contract claim.

Second, even assuming, *arguendo*, that Goodwin's claim could survive despite the presence of his breach of contract claim, the funds are not sufficiently identifiable to establish a claim of conversion.  "Where an action for conversion is based on the conversion of cash, the action will 'only lie if identification is possible and there is an obligation to deliver the specific money in question.'"

55

*Gascho*, 863 F. Supp. 2d at 700 (quoting *Dice v. White Family Cos., Inc.*, 878 N.E.2d 1105, 1109 (Ohio Ct. App. 2d Dist. 2007)).  In other words, "[a]n action alleging conversion of cash lies only where the money involved is 'earmarked' or is specific money capable of identification, *e.g.,* money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum.'"  *Id.* (quoting *Haul Transport of VA, Inc. v. Morgan*, No. 14859, 1995 WL 328995, at *4 (Ohio Ct. App. 2d Dist. June 2, 1995).

In this case, Goodwin does not identify specific funds, only a sum of money that he claims should have been returned to him.  Indeed, it is undisputed that Goodwin's escrow deposits were not deposited into a separate account, but commingled with GLC's other funds.  (Doc. No. 63-1 at 149:19-150:2.)  Thus, summary judgment in favor of Defendants on Goodwin's conversion claim is warranted.

With respect to King conversion claim, he has submitted evidence that he made improvements to his truck in the form of a chrome gear shifter, that he attempted to remove his belongings from his truck, but was prevented from fully doing so by an AMX employee, and that GLC then parted out the truck to be sold for scrap.  (Doc. No. 12-1 at 85:19-86:14; Doc. No. 73-1 at 197:17-25, 318:13-19.)  Thus, the Court finds he has presented sufficient evidence of his conversion claim to survive summary judgment with respect to AMX and GLC.  However, Plaintiffs have not identified any evidence demonstrating that IFG was involved in any way or that any of the individual Defendants personally converted his belongings such that they could be held liable.

Accordingly, Defendants Motions for Summary Judgment are granted with respect to Goodwin's conversion claim in Count Five against all Defendants and with respect to King's

56

conversion claim against IFG and the individual Defendants.   AMX's and GLC's Motions for Summary Judgment are denied with respect to King's conversion claim against them.

### ix.   Count Six

In Count Six of their Amended Complaint, Plaintiffs allege that Defendants violated Ohio's Business Opportunity Plan Act (the "Act") by failing to reduce their lease purchase agreements to writing and to make certain required written disclosures.   (Doc. No. 30 at ¶¶ 271-89.)   Defendants, excluding GLC, contend they are entitled to summary judgment on this claim because they never entered into a contractual relationship with Plaintiffs, while GLC asserts that summary judgment in its favor is warranted because it never sold Plaintiffs a business opportunity, as that term is defined under the Act.   (Doc. No. 75 at 21; Doc. No. 76 at 15-16.)   In response, Plaintiffs contend that there is at least a question of fact as to whether their lease purchases satisfy the requirements of a business opportunity under Ohio law.   (Doc. No. 86 at 22-25.)   The Court concludes that summary judgment in favor of Defendants is warranted.

Under the Act, a seller of a busines opportunity plan must provide certain written disclosures prior to the execution of any agreement.   *See* O.R.C. § 1334.02.   The Act defines a business opportunity plan, in relevant part, as "an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services."   O.R.C. § 1334.01(D).   Courts have held that this requirement may be satisfied if the purchaser obtains the "method of operation" to provide services from the seller. *Cook v. Employers Overload Co.*, No. C-2-87-0079, 1987 U.S. Dist. LEXIS 17094, at *4 (S.D. Ohio Aug. 18, 1987).   For example, in *Cook*, the court found that the plaintiff franchisee had stated a claim under the Act when he alleged that the defendant franchisor "provide[d] plaintiff with a format, a

method of operation, a method of advertising, and all or certain of its names and marks so that plaintiff could open a franchise which provided 'temporary help service.'"  *Id.* at *1, *6.

Here, Plaintiffs contend that they purchased the right to distribute services because AMX and/or Gurai Leasing provided Plaintiffs with the method of operation to transport cargo by providing Plaintiffs: (1) semi-truck cabs, which Plaintiffs financed through weekly truck payment deductions; (2) shippers requiring drivers to deliver freight; and (3) authority to transport goods in interstate commerce.  (Doc. No. 86 at 24.)  The Court agrees that had Defendants' provision of each of these items been part of the lease purchase agreements, those agreements would have qualified as business opportunity plans under the Act.  Indeed, that was the basis for the Court's earlier order denying Defendants' Motion to Dismiss with respect to Count Six.  (*See* Doc. No. 58.)  However, Plaintiffs have not submitted evidence establishing that paying for these rights was a part of their lease purchases.  Instead, the Court agrees with Defendants that Plaintiffs were merely purchasing their respective trucks.  To illustrate, there is no evidence that had Plaintiffs had the cash to pay off the rest of the purchase price on their trucks after only a month or two that they would have obtained anything other than the title to their trucks.  At no point did Plaintiffs purchase the right to operate under AMX's operating authority.  To the contrary, part of the attraction of the lease purchase was to be able to use the truck for carriers other than AMX once it was paid off.  (*See* Doc. No. 12-1 at 183:13-22.)

Plaintiffs rely on two cases from other states in support of their claim, each of which found that similar lease purchase agreements were business opportunities under those states' business opportunity statutes.  However, both cases are distinguishable in that the statutes at issue specifically provided that the regulated business opportunities included the sale or lease of a product to the

58

purchaser and did not require the purchaser to "obtain[] the right to offer, sell, or distribute goods or services."  O.R.C. § 1334.01(D).  For example, in *Tousley v. North Am. Van Lines, Inc.*, the South Carolina statute at issue defined business opportunity, in relevant part, as "the sale or lease of any products, equipment, supplies or services which are sold to the purchaser for the purpose of enabling the purchaser to start a business."  752 F.2d 96, 104 (4th Cir. 1985).  Similarly, in *Roberts v. C.R. England, Inc.*, the Utah statute at issue defined the regulated plan, in relevant part, as "the sale or lease of any products, equipment, supplies, or services that are sold to the purchaser upon payment of an initial required consideration of $300 or more for the purpose of enabling the purchaser to start a business."  318 F.R.D. 457, 495 (D. Utah 2017).  Thus, the Court finds these cases unpersuasive.

Accordingly, Defendants' Motions for Summary Judgment are granted with respect to Count Six of Plaintiffs' Amended Complaint.

### x.  Counts Seven, Eight, and Nine

In Counts Seven, Eight, and Nine, Plaintiffs assert that they were discriminated against on the basis of race with respect to both their pay and termination from employment.  (Doc. No. 30 at ¶¶ 290-312.)  Defendants, excluding Gurai, argue that Plaintiffs' claims fail because they were not Plaintiffs' employer, while Gurai asserts that Plaintiffs have not presented evidence of any discriminatory conduct.  (Doc. No. 75 at 21-22; Doc. No. 76 at 16-17.)  In response, Plaintiffs appear to abandon their claims of discrimination.  Instead, Plaintiffs assert a retaliation claim, arguing that they were terminated as a result of their complaints regarding racial harassment and the terms of their lease purchase agreements.  (Doc. No. 86 at 37-39.)  In their reply, Defendants contend that Plaintiffs have not provided any evidence that they engaged in protected activity in support of their retaliation claim or that they were terminated as a result of any alleged protected activity.  (Doc. No. 90 at 23-

24.)  The Court concludes that Defendants are entitled to summary judgment on all claims asserted under Counts Seven, Eight, and Nine.

First, even assuming, *arguendo*, that Plaintiffs engaged in protected activity, they have not presented sufficient evidence of a causal connection between their protected activity and their terminations for their retaliation claims to survive summary judgment.  "Absent direct evidence of retaliation, a plaintiff may establish an inference of retaliation using the burden-shifting framework promulgated in *McDonnell Douglas*."  *Tanksley v. Howell*, No. 19AP-504, 2020 WL 5203568, at *7 (Ohio Ct. App. 10th Dist. Sept. 1, 2020).  Under that framework, a plaintiff must first establish "a prima facie case of retaliation by demonstrating that: (1) the plaintiff engaged in a protected activity, (2) the defendant was aware of the protected activity, (3) the defendant took an adverse employment action against the plaintiff, and (4) that a causal link exists between the protected activity and the adverse action."  *Id.*  "If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for its actions."  *Id.*  Finally, "[i]f the defendant carries this burden of production, the burden then shifts back to the plaintiff to demonstrate that the reason proffered by the defendant was not the true reason for the employment decision, but was a pretext for discrimination."  *Id.*

The fourth, and final, element of a prima facie case requires plaintiffs to show that a causal connection between the protected activity and the adverse employment action exists.  *See Mys v. Michigan Dep't of State Police,* 886 F.3d 591, 600 (6th Cir. 2018).[9]  "Causation can be established

---

[9] The Court cites cases involving Title VII as well as Ohio law, since "[b]ecause of the[] statutes' similar language and origin, Ohio courts have held that '[f]ederal law provides the applicable analysis for reviewing retaliation claims' brought under Ohio Rev. Code. § 4112.02(I)."  *Wade v. City of Toledo*, No. 3:18 CV 1978, 2020 WL 1140075, at *10 (N.D. Ohio Mar. 9, 2020) (quoting *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 12th Dist. 1998)).

by indicia of retaliatory conduct, such as evidence that the plaintiff was treated differently than similarly situated employees who did not engage in protected activity or evidence that the plaintiff was subjected to closer disciplinary scrutiny after engaging in protected activity." *Green v. Cent. Ohio Transit Auth.*, 647 F. App'x 555, 560 (6th Cir. 2016).

The Sixth Circuit has held that "temporal proximity between the employee's engagement in protected conduct and the adverse employment action also plays a role in the causation analysis, though the circuit's case law is inconsistent on whether temporal proximity standing alone is sufficient to establish causation." *Id.* However, for temporal proximity to ever be sufficient by itself, the adverse employment action must take place close in time after an employer learns of the protected activity. *See Wade v. City of Toledo*, No. 3:18 CV 1978, 2020 WL 1140075, at *11 (N.D. Ohio Mar. 9, 2020) ("Temporal proximity may in some circumstances be 'enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation', but only when 'an adverse employment action occurs very close in time after an employer learns of a protected activity.'") (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Jackson v. Baxter Int'l, Inc.*, No. 1:06CV2802, 2007 WL 4510258, at *4 (N.D. Ohio Dec. 18, 2007) ("[T]he Sixth Circuit has consistently determined temporal proximity beyond three months, absent some further indicia of retaliation was insufficient to infer causation.").

In the instant matter, in support of their retaliation claims, Plaintiffs rely entirely on the temporal proximity between their protected activity and termination to establish a causal connection, arguing that "it was only after complaining about their unfair treatment that it was determined that they would not be permitted to drive for AMX." (Doc. No. 86 at 38.) However, Plaintiffs provide no evidence as to when they made such complaints, and the fact that their termination occurred after

61

their alleged protected activity is not enough by itself to establish a causal connection.  Instead, the termination must have occurred close in time to their protected activity.  Without evidence of a close temporal proximity, neither Plaintiff has established a prima face case of retaliation.  As a result, summary judgment in favor of Defendants on Plaintiffs' retaliation claims is warranted.

Next, to the extent that Plaintiffs continue to press their claims related to their discriminatory pay and termination, they have failed to present sufficient evidence to survive summary judgment on those claims as well.  As with retaliation claims, claims of discrimination are subject to the burden-shifting framework of *McDonnell Douglas* in the absence of direct evidence of discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 865-66 (6th Cir. 2003).  Under this framework, "the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination."  *Id.* at 866.  To establish a prima facie case of discrimination, a plaintiff must "show that 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000).

Similarly, to establish a prima facie case under Ohio's version of the Equal Pay Act, O.R.C. § 4111.17, a "plaintiff must show that he, as a member of a protected class, was paid less than employees who are outside the protected class 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions.'" *Carson v. Patterson Dental Supply, Inc.*, No. 2:08-CV-00653, 2009 WL 4547592, at *12 (S.D. Ohio Dec. 2, 2009) (quoting O.R.C. § 4111.17(A)).

Here, Plaintiffs have not identified any evidence of similarly situated employees in support of a prima facie case that their termination or pay was discriminatory.  Plaintiffs have not identified any employees that engaged in similar conduct that were not terminated, have not shown that they were replaced by individual outside of their protected class, and have not identified any employees that were paid more for similar work.  Consequently, Plaintiffs' claims cannot survive summary judgment.

Accordingly, Defendants' Motions for Summary Judgment are granted as to Counts Seven, Eight, and Nine of Plaintiffs' Amended Complaint.

### xi.   Count Ten

In Count 10 of their Amended Complaint, Plaintiffs set forth claims of hostile work environments.  (Doc. No. 30 at ¶¶ 313-23.)  Defendants argue they are entitled to summary judgment on this claim for a variety of reasons.  Specifically, all Defendants, except GLC, assert they were not Plaintiffs' employer.   (Doc. No. 75 at 21-22.)   GLC argues it had no ability to control AMX employees, who were responsible for the alleged harassment.  (Doc. No. 76 at 17.)  All Defendants also contend that there is no evidence of supervisory personnel engaging in harassment or that Plaintiffs were subject to severe or pervasive harassment.  (Doc. No. 90 at 22-23.)  In response, Plaintiffs point to a variety of incidents that they assert amount to a hostile work environment.  (Doc. No. 86 at 35-37.)  The Court finds that Defendants are entitled to summary judgment, as Plaintiffs have failed to present sufficient evidence of severe or pervasive harassment.

"In order to support a claim for hostile environment race harassment, a party must prove . . . '(1) that the harassment was unwelcome, (2) that the harassment was based on race, (3) that the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) that either (a) the

63

harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, [knew] or should have known of the harassment and failed to take immediate and appropriate corrective action.'" *Jenkins v. Giesecke & Devrient Am., Inc.*, 985 N.E.2d 176, 180 (Ohio Ct. App. 9th Dist. 2012) (quoting *Williams v. Spitzer Auto World Amherst Inc.*, No. 07CA009098, 2008 WL 835839, at *2 (Ohio Ct. App. 9th Dist. Mar. 31, 2008)).

In order to survive summary judgment, plaintiffs "cannot rely on conjecture or conclusory accusations" that they were harassed based on their protected status. *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008); *see also Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 433 (6th Cir. 2014) (holding several of the plaintiff's allegations failed to meet "the requirement that the harassing behavior be because of [the plaintiff's] race" because "[t]he record is devoid of evidence to indicate that" the harassment occurred "because he is African–American").[10]

In this case, there is no evidence that two of the alleged instances of harassment were based on Plaintiffs' race.  First, Plaintiffs assert that they were required to use separate outdoor port-a-johns, while other drivers were permitted to use more comfortable indoor facilities.  (Doc. No. 86 at 35.) However, the testimony from Dhillon that is relied on by Plaintiffs does not support this assertion. Dhillon testified that drivers use an outside restroom, while AMX office employees may use a restroom inside the office.  (Doc. No. 72-1 at 147:2-149:3.)  The only drivers that Dhillon testified were permitted to use the restroom were himself and Gurai, who, as owners of AMX and GLC, respectively, are both clearly differently situated than a normal driver like King or Goodwin.  (*Id.*) There is no evidence that Plaintiffs were excluded from use of the office restroom based on their race.

---

[10] The Court may rely on federal cases involving hostile work environment claims under Title VII, as "Ohio's requirements are the same as under federal law." *Satterwhite v. Faurecia Exhaust Sys., Inc.*, No. 3:02-CV-574, 2005 WL 1279253, at *13 (S.D. Ohio May 31, 2005).

Second, in support of his claim, King asserts that Parmjit told him to "work harder." (Doc. No. 86 at 35 n.52.) But the evidence shows Parmjit wrote that King needed to "work hard" on one of King's settlement statements when his pay was relatively low for the week. (Doc. No. 12-1 at 179:4-25; Doc. No. 63-1 at 349:16-25.) There is no evidence that the comment was connected to King's race in any way. Thus, neither of these alleged acts of harassment may support Plaintiffs' claims.

The remaining acts of harassment that are linked to race are not sufficiently severe or pervasive for Plaintiffs' claims to survive summary judgment. For alleged harassment to be actionable, "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). "To determine whether an environment is sufficiently hostile or abusive, a court must consider 'all of the circumstances,' including the 'frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Lindsey*, 295 F. App'x at 766 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The harassment "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotations and citations omitted).

To illustrate, in *Clay v. United Parcel Service, Inc.*, the Sixth Circuit held that fifteen specific incidents of racially-motivated harassment spanning a two-year period, including the refusal to remove the plaintiff from a position that required heavy lifting that resulted in a groin injury to the

plaintiff, were not sufficiently severe or pervasive to be actionable.  501 F.3d 695, 707-08 (6th Cir. 2007); *see also Bourini v. Bridgestone/Firestone N. Am. Tire, LLC*, 136 F. App'x 747, 749, 751 (6th Cir. 2005) (holding eight incidents over five years—including statements from the Muslim plaintiff's coworker that if it was up to him, he would "put [plaintiff] in a box and send [him] back to [his] country," and that the plaintiff could hear better if he got the sand out of his ears—were not sufficiently severe or pervasive to create a hostile work environment); *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (affirming summary judgment for the defendant even though the female plaintiff asserted that her male supervisor implied he would improve her performance evaluation in exchange for sexual favors, told several dirty jokes in her presence, called her "hot lips," and commented on multiple occasions about her state of dress).  As these cases show, the Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory."  *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017).

Beyond the restroom issue discussed above, Goodwin has not identified any other acts of alleged harassment based on his race.  Accordingly, Defendants are entitled to summary judgment on Goodwin's hostile work environment claim.

With respect to King, at most, he has presented evidence of four incidents of racial harassment during his time as a driver with AMX and GLC: (1) Cain's comment regarding voting for Barack Obama; (2) Kyle's statement relaying to King that Behringer had made comments regarding dumb nigger truck drivers; (3) an unknown individual at a Christmas party calling King a nigger, after which King never saw the individual again; and (4) an AMX mechanic calling King a nigger, after which King never spoke to him again.  (Doc. No. 12-1 at 237:25-238:8, 240:25:241:25, 242:13-243:11.)  These incidents were highly offensive and inappropriate.  However, these four incidents

66

over a period of a little over three years of work, from April 2011 to June 2014, are not severe or pervasive enough to be actionable.  Consequently, Defendants are entitled to summary judgment on King's hostile work environment claim as well.

Accordingly, Defendants' Motions for Summary Judgment are granted as to Count Ten of Plaintiffs' Amended Complaint.

### xii.  Counts Eleven and Fifteen

In Counts Eleven and Fifteen of their Amended Complaint, Plaintiffs set forth claims under the OMFWSA and the FLSA, respectively, based on Defendants' alleged failure to pay Plaintiffs the mandated minimum wage.  (Doc. No. 30 at ¶¶ 324-32, 357-69.)  Defendants argue that Plaintiffs' claims fail for a couple of reasons, including the fact that Plaintiffs have not identified any weeks in which they were paid under the minimum wage that are within the relevant statutes of limitations. (Doc. No. 75 at 21-22; Doc. No. 76 at 17-19, 22; Doc. No. 90 at 21-22.)  In response, Plaintiffs contend that the statute of limitations on their claims did not start to run until they were terminated and that they have identified several specific weeks in which they were paid below the minimum wage.  (Doc. No. 86 at 33-35.)  The Court agrees with Defendants that Plaintiffs' claims are time barred.

With respect to Plaintiffs' federal claims, "[a]n FLSA plaintiff generally has two years to file suit, but the statute of limitations increases to three years if the claim consists of a 'willful violation.'" *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 675 (6th Cir. 2012) (quoting 29 U.S.C. § 255(a)).  Significantly, "[a]n FLSA cause of action accrues 'at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed.'"  *Id.* (quoting *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169,

187 (6th Cir. 2008)); *see also Rumpz v. Am. Drilling & Testing, Inc.*, No. 09–10971, 2009 WL 3464826, at *3 (E.D. Mich. Oct. 23, 2009) ("In cases arising under the FLSA, courts have found that violations based on improper calculation of wages or overtime wages constitute independent causes of action which accrue with each new paycheck."). Thus, Plaintiffs' claims under the FLSA accrued—and the statute of limitations started to run—at the time of any alleged underpayment, not when Plaintiffs were terminated. Assuming, *arguendo*, that such violations were willful, a three-year statute of limitations would apply, and any violations that occurred more than three years before Plaintiffs filed suit are time barred.

There is a three-year statute of limitations with respect to Plaintiffs' minimum wage claims under Ohio law as well. O.R.C. § 4111.02 provides that "[e]very employer, as defined in Section 34a of Article II, Ohio Constitution, shall pay each of the employer's employees at a wage rate of not less than the wage rate specified in Section 34a of Article II, Ohio Constitution." In turn, O.R.C. § 4111.14(K) provides that "an action for equitable and monetary relief may be brought . . . for any violation of Section 34a of Article II, Ohio Constitution, or any law or regulation implementing its provisions within three years of the violation or of when the violation ceased if it was of a continuing nature." Based on this language, Plaintiffs contend that the statute of limitations for their minimum wage claims under Ohio law did not commence until Plaintiffs were terminated because Defendants' violations were continuing and did not cease until Plaintiffs' termination. (Doc. No. 86 at 34.) However, Plaintiffs do not provide any authority in support of their contention, and the Court finds it unpersuasive. In evaluating similar arguments in the context of the FLSA, courts have held that because each underpayment is an independent violation, the continuing violations doctrine does not provide a means to save causes of action for violations occurring outside the statute of limitations.

68

*E.g.*, *Rumpz*, 2009 WL 3464826, at *4.  The Court believes the same principle should be applied to the statute of limitations under Ohio law, especially given the similarities between Ohio law and the FLSA.  *See Heard v. Nielson*, No. 1:16-CV-1002, 2017 WL 2426683, at *2 (S.D. Ohio June 2, 2017) (analyzing claims under the FLSA and Ohio law together because "Ohio law incorporates the FLSA's definitions, standards, and principles for its minimum wage and overtime compensation provisions").  Accordingly, any alleged violations of Ohio's minimum wage requirements occurring more than three years before Plaintiffs filed suit are time barred, regardless of when Plaintiffs were terminated.

This means that King's claims under the FLSA and Ohio law are completely barred.  King's last day as a driver was June 13, 2014.  (Doc. No. 76-1 at ¶ 41.)  King did not file suit until September 25, 2017, well after the three-year statutes of limitations had expired.  *King v. Am. Marine Express, Inc.*, Cuyahoga County Court of Common Pleas, Case No. CV-17-886390.  Thus, Defendants are entitled to summary judgment on King's minimum wage claims.

Although Goodwin filed suit shortly after he was terminated, his claims also are time barred, as he has not identified any violations that occurred within three years of when he commenced his action against Defendants.  Goodwin filed his original Complaint in state court on September 21, 2017.  *Goodwin v. Am. Marine Express, Inc.*, Cuyahoga County Court of Common Pleas, Case No. CV-17-886259.  Therefore, any minimum wage claims for pay weeks predating September 21, 2014 are time barred.  Goodwin has only identified two weeks within the statute of limitations in which he asserts he was paid below the minimum wage.  (Doc. No. 86 at 35.)  In one of those weeks, he was paid $162.00, but it appears he only made one delivery to Pittsburgh, Pennsylvania that week.  (Doc. No. 86-67.)  Goodwin has not presented any evidence as to how long it took him to complete this delivery or otherwise established that the payment he received for what he claims was a 270-mile

roundtrip would fall below the hourly minimum wage for either federal or Ohio law.  (Doc. No. 86 at 35.)  For the other week identified, Goodwin asserts he was only paid $54.06, but this ignores a $50 cash advance made during the week.  (*See* Doc. No. 86-68.)  And again, it appears he only made two trips this week, neither of which has Goodwin established were so long that he received less than the minimum wage.  (*Id.*)  Therefore, Goodwin has failed to present sufficient evidence of any minimum wage violations within the applicable statutes of limitations.

Accordingly, Defendants' Motions for Summary Judgment are granted with respect to Counts Eleven and Fifteen of Plaintiffs' Amended Complaint.

### xiii.  Count Twelve

In Count Twelve of their Second Amended Complaint, Plaintiffs set forth claims for the non-payment of wages.  (Doc. No. 30 at ¶¶ 333-38.)  Defendants, excluding GLC, assert they are entitled to summary judgment on this claim because they are not Plaintiffs' employer, while GLC argues that the claim is barred by the statute of limitations.  (Doc. No. 75 at 21-22; Doc. No. 76 at 19-20.)  Plaintiffs do not specifically address this claim in their opposition brief, but instead include a section with respect to their wage claims generally that is largely focused on their minimum wage claims.  (*See* Doc. No. 86 at 33-35.)  Given that the Court has determined that Defendants are entitled to summary judgment on Plaintiffs' other wage related claims, and Plaintiffs have failed to address this claim in any way or show how it differs, the Court finds this claim likewise fails.  Accordingly, the Court grants Defendants' Motions for Summary Judgment with respect to Count Twelve of Plaintiffs' Amended Complaint.

### xiv.  Count Thirteen

In Count Thirteen of their Amended Complaint, Plaintiffs claim that Defendants violated two Ohio statutes by (1) compelling Plaintiffs to purchase fuel and repairs from AMX, (2) selling fuel and repair services to Plaintiffs above the market rate, and (3) deducting Plaintiffs' wages for repairs without an express agreement.  (Doc. No. 30 at ¶¶ 339-47.)  Defendants, excluding GLC, move for summary judgment on Count Thirteen on the basis that they were not Plaintiffs' employer.  (Doc. No. 75 at 21-22.)  GLC argues it also is entitled to summary judgment because it did not compel the purchase of any good or supplies, it made Plaintiffs aware of any expenses, and AMX's fuel and repair prices were less than the market rate.  (Doc. No. 76 at 20.)  In response, Plaintiffs contest each of these points.  (Doc. No. 86 at 32-33.)  The Court finds that all Defendants are entitled to summary judgment on Count Thirteen.

First, the Court assesses whether Defendants violated O.R.C. § 4113.18, which provides:  "No person shall compel, seek to compel, or attempt to coerce an employee of himself or another to purchase goods or supplies from a particular person, firm, or corporation."  Goodwin has failed to identify any evidence demonstrating that he was compelled to purchase fuel or repair from AMX.  (*See* Doc. No. 86 at 32.)  As such, Defendants are entitled to summary judgment on his claim under O.R.C. § 4113.18.  King does cite to his deposition testimony in support of his claim in which he asserts he was told to buy fuel from AMX, but he does not identify who informed him of this.  (*See* Doc. No. 142:20-21 ("I was told don't buy fuel nowhere but AMX."); *id.* at 143:18-19 ("They told me to buy my fuel from there, AMX.").)  On summary judgment, the Court cannot speculate as to whether King was told this by an employee from AMX, a representative of GLC, or one of the

individual Defendants.  Thus, Defendants are entitled to summary judgment on King's claim pursuant to O.R.C. § 4113.18 as well.

Next, the Court will address Plaintiffs' claims under O.R.C. § 4113.19, which provides:

> No person shall sell goods or supplies to his employee, or pay such employee wages or a part thereof in goods or supplies, directly or through the intervention of scrip, orders, or other evidence of indebtedness, at higher prices than the reasonable or current market value in cash of such goods or supplies, or, without an express contract with his employee, deduct or retain the wages of such employee, or a part thereof, for wares, tools, or machinery destroyed or damaged.

Plaintiffs contend Defendants violated the first part of this statute because AMX sold fuel and repair services to Plaintiffs at prices above the market rate.  (Doc. No. 86 at 32-33.)  The Court finds Plaintiffs have failed to present sufficient evidence in support of this claim.  While Plaintiffs have provided evidence that AMX sold fuel and repair services above its own costs (*see* Doc. No. 64-3 at 513:18-514:2), they have not provided any evidence that these markups were unreasonable or above the market rate.  The only evidence on that more specific issue is Dhillon's declaration in which he states that AMX charged five cents less per gallon than a nearby gas station and charged $20 per hour less than truck dealers for repairs and maintenance.  (Doc. No. 75-1 at ¶¶ 30, 43.)  As a result, Defendants are entitled to summary judgment on this portion of Plaintiffs' claims under O.R.C. § 4113.19.

Finally, Plaintiffs assert that Defendants violated the second part of O.R.C. § 4113.19 by taking deductions from Plaintiffs' pay for truck repairs without an express agreement.  (Doc. No. 86 at 32.)  Plaintiffs contend that O.R.C. § 4113.19 requires a written contract.  (*Id.*)  However, the language of O.R.C. § 4113.19 only requires an "express contract," not a written one.  Nor does the case relied on by Plaintiffs stand for the proposition that a written contract is required.  Instead, in *Kent v. Terrace Gardens, Inc.*, the court found in favor of the employee for amounts withheld to pay

72

for a damaged lawnmower because "there [was] clearly no showing that [the employee] made an *express contract* with appellant to be liable for any equipment damages while employed with appellant's landscaping business."  No. 88 C.A. 133, 1989 WL 59238, at *2 (Ohio Ct. App. 7th Dist. June 5, 1989) (emphasis added).  In contrast, here, although the contracts were verbal, Plaintiffs did enter into express contracts in which they were liable for the costs of repairing their trucks.  (*See* Doc. No. 12-1 at 185:20-22; Doc. No. 13-1 at 115:2-17, 149:10-15; Doc. No. 76-1 at ¶¶ 32, 47.)  Thus, their claims fail in this regard as well.

Accordingly, Defendants' Motions for Summary Judgment are granted with respect to Count Thirteen of Plaintiffs' Amended Complaint.

### xv.   Count Fourteen

In Plaintiffs' Motion for Partial Summary Judgment, they move for summary judgment against AMX and GLC with respect to Count Fourteen of their Amended Complaint, which is based on Defendants' alleged violations of the Truth-in-Leasing regulations.  (Doc. No. 61.)  In response, AMX and GLC argue that Plaintiffs are not entitled to summary judgment on Count Fourteen for several reasons.  Specifically, AMX and GLC assert that Plaintiffs were not owners of their trucks, and the regulations are therefore inapplicable.  (Doc. No. 81 at 5-8.)  GLC also asserts that the regulations do not apply to it because it is not a motor carrier, while AMX asserts it cannot be held liable based upon agreements that were solely between GLC and Plaintiffs.  (*Id.* at 8-14.)  Finally, AMX and GLC contend that Plaintiffs have no provable damages.  (*Id.* at 14-17.)  AMX and GLC also move for summary judgment with respect to Count Fourteen based on similar arguments that they presented in opposition to Plaintiffs' Motion.  (Doc. No. 75 at 21; Doc. No. 76 at 20-22.)  In addition, IFG and the individual Defendants move for summary judgment on the basis that none of

them entered into any contractual relationship with Plaintiffs.  (Doc. No. 75 at 21.)  As such, the Court will assess the parties' cross-motions for summary judgment on Count Fourteen together to determine whether summary judgment is appropriate with respect to any party.  Upon review of the parties' arguments, the Court concludes that issues of fact preclude granting summary judgment in favor of Plaintiffs, AMX, or GLC, but that IFG and the individual Defendants are entitled to summary judgment on Court Fourteen.

As previously noted, it is common in the trucking industry for independent owner-operators to lease truck equipment and provide driving services to federally regulated motor carriers.  *Smiley v. Smooth Operators, Inc.*, No. 06-C-146-C, 2006 WL 1896357, at *2 (W.D. Wis. July 6, 2006).  These leases are governed by what are known as the Truth-in-Leasing regulations.  *Id.*  The Ninth Circuit has described the general purpose and framework of the Truth-in-Leasing regulations as follows:

> There are hundreds of thousands of owner-operators in the United States, many of whom contract with various federally regulated motor carriers.  Under federal law, motor carriers are required to register with the Department of Transportation ("DOT") in order to ship most types of cargo in interstate commerce.  49 U.S.C. §§ 13901, 13902; 49 C.F.R. § 367.4 ("Requirements for registration").  Once registered, these carriers are statutorily obliged to comply with certain regulations promulgated by the DOT.  49 U.S.C. § 13902(a)(1); 49 C.F.R. § 367.7.  A primary goal of this regulatory scheme is to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position.  For example, the statute authorizes the DOT to require that all leases between motor carriers and owner-operators be in writing and contain certain basic information, such as the duration of the lease and the compensation to be paid the owner-operator.  49 U.S.C. § 14102(a); *see* 49 C.F.R. § 376.11(a) (requiring that leases be in writing); *id.* § 376.12(b) (requiring that leases "specify the time and date . . . on which the lease begins and ends"); *id.* § 376.12(d) (requiring that the amount to be paid to the owner-operator be "clearly stated on the face of the lease").

*Owner Operator Independent Drivers Ass'n, Inc. v. Swift Transp. Co., Inc.*, 367 F.3d 1108, 1110 (9th Cir. 2004); *accord In re Arctic Express Inc.*, 636 F.3d 781, 795 (6th Cir. 2011) ("Congress's

substantive purpose in authorizing the Truth–in–Leasing regulations was to protect owner-operators.") (quoting *Swift*, 367 F.3d at 1115).

In this case, there is no dispute that AMX and GLC never entered into any written agreements with either Plaintiff regarding their lease purchases or provision of services.  AMX and GLC dispute, however, whether these regulations are applicable to the circumstances of this case.  As an initial matter, they contend that the regulations are inapplicable because Plaintiffs did not own the respective trucks that they were lease purchasing.  (Doc. No. 81 at 5-8.)  Plaintiffs acknowledge that they were never the titled owners of their trucks, but assert that they still qualify as owners under the Truth-in-Leasing regulations because they had exclusive use of the trucks under their lease purchase agreements.  (Doc. No. 61 at 11-12.)  The Court finds a question of fact exists as to this issue.

Under the Truth-in-Leasing regulations, an "authorized carrier may perform authorized transportation in equipment it does not own" only if certain conditions are satisfied, including the requirement of a "written lease granting the use of the equipment and meeting the requirements contained in § 376.12."  49 C.F.R. § 376.11(a).  In turn, § 376.12 provides that "[t]he lease shall be made between the authorized carrier and the *owner of the equipment*."  49 C.F.R. § 376.12(a) (emphasis added).  Thus, Plaintiffs must be considered owners of their respective trucks to fall within the protections of the regulations.

The regulations define "owner" as "[a] person (1) to whom title to equipment has been issued, or (2) *who, without title, has the right to exclusive use of equipment*, or (3) who has lawful possession of equipment registered and licensed in any State in the name of that person."  49 C.F.R. § 376.2(d) (emphasis added).  Significantly, courts have concluded that individuals who are lease purchasing trucks may be considered owners under the Truth-in-Leasing regulations based on their right to

75

exclusive use of the trucks.  For example, in *Bonkowski v. Z Transport, Inc.*, the plaintiff entered into a lease purchase agreement with a motor carrier in which the plaintiff agreed to a $10,000 down payment and to pay off the remainder of the amount due over a thirty month period, during which time the title for the truck would remain with the motor carrier.  No. 00 C 5396, 2004 WL 524723, at *1-2 (N.D. Ill. Mar. 5, 2004).  However, the plaintiff "paid for all the fuel, repairs, and maintenance for the truck," "was the exclusive driver," and "was in exclusive possession of the tractor."  *Id.* at *2. The court concluded that the plaintiff met the regulatory definition of owner, reasoning: "Plaintiff's unrebutted testimony at trial establishes that during the period that the tractor was in his possession, he used it to the exclusion of all others.  Although Plaintiff did not have title to the tractor, he was an owner of the tractor under the regulations."  *Id.*; *see also Shimko v. Jeff Wagner Trucking, LLC*, No. 11–cv–831–wmc, 2014 WL 7366190, at *3 (W.D. Wis. Dec. 24, 2014) ("Shimko has at least created a genuine dispute of fact as to whether he 'owned' the truck and trailer under the regulations.  In particular, he offers his own sworn declaration, stating that he had the 'exclusive right to use' the truck and trailer, which if true would satisfy the second definition of 'owner' under the regulations."); *Crown Transp, Inc. v. Smith Systems Transp, Inc.*, No. 06-CV-590-TCK-PJC, 2008 WL 1766736, at *9 (N.D. Okla. Apr. 11, 2008) ("'[O]wnership' under TLA Regulations is a term of art that includes individuals who lack title but have the 'right to exclusive use.'").

In this case, Plaintiffs have presented evidence that after entering into their respective lease purchase agreements, they had the right to exclusive use of their trucks.  For example, Parmjit testified during her deposition as follows:

Q. Can we agree that Mr. King was lease-purchasing 214?

A. Truck 214?

Q. Yeah.

A. Yes.

Q. And while he was lease-purchasing that was King's truck, during the period of the time of the lease-purchase?  No one else was driving that truck while King was driving -- or no one else was driving 214 while King had the lease-purchase?

A. Right. He was the only one.

Q. Right. And Truck 155, the same thing, only Glenn Goodwin was driving it when it was under a lease-purchase?

A. Right.

(Doc. No. 63-1 at 137:1-16.)  Gurai similarly testified that King and Goodwin were the only drivers of their respective trucks.  (*See* Doc. No. 73-1 at 197:12-16.)  Although the testimony is a little unclear, Gurai also testified during his deposition that King and/or Goodwin often drove their trucks home despite Gurai discouraging them from doing so.  (*Id.* at 205:11-207:4.)  When asked why he did not stop them, Gurai stated, "I can't push the guy, you know, but I tell him.  When he said, that's my truck, I lease it from you, that's -- you can't say anything."  (*Id.* at 207:2-4.)  Gurai admitted that King made improvements to his truck as well.  (*Id.* at 197:17-25.)

On the other hand, AMX and GLC point out that Plaintiffs' trucks were already subject to lease agreements between GLC and AMX, which provided AMX the right to disqualify drivers of the trucks that were found to be "unsafe, unqualified pursuant to federal or state law, in violation of CARRIER'S minimum qualification standards or incompetent."  (Doc. No. 75-2 at Ex. B-5 at PageID#11501, Ex. B-10 at PageID#11514.)  In support of their contention that Plaintiffs were not owners, AMX and GLC also cite to Goodwin's deposition testimony in which he admitted that his use of the truck was still limited:  "I am an owner/operator in the sense that I am an owner on paper. I mean.  I am not an owner in the sense that I can do whatever I want with the truck.  I mean, they

77

still controlled every aspect of the truck."  (Doc. No. 13-1 at 111:7-11.)  Given this conflicting evidence, the Court finds that there is a genuine dispute of fact regarding the exact nature of the lease purchase agreements and whether Plaintiffs were entitled to exclusive use of their trucks.  It is especially unclear how Plaintiffs' lease purchase agreements were affected by the leases already in existence between GLC and AMX with respect to the trucks at issue, which required that the trucks be used for the transportation of freight under AMX's operating authority.[11]  This factual issue alone precludes the grant of summary judgment in Plaintiffs' favor.

In addition, because King and Goodwin may have been owners of Units 214 and 155, respectively, and AMX as an authorized carrier transported freight in these trucks that it did not own, there remains a dispute over whether AMX was required to enter into a written lease with King and Goodwin that granted AMX use of the trucks and contained the other provisions required by the regulations.  *See* 49 C.F.R. § 376.11 ("[T]he authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions: (a) Lease. There shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.12.").

The Court will next examine GLC's argument that it cannot be held liable for violations of the Truth-in-Leasing regulations because it is not a federally authorized motor carrier.  (Doc. No. 81 at 8-12.)  Plaintiffs do not dispute that GLC is not a motor carrier, but argue that it may still be held

---

[11] The Court notes, however, that the fact that a lease purchase requires the driver to operate the truck for a specific motor carrier does not necessarily mean the driver did not have exclusive use of the truck.  *See Owner-Operator Independent Drivers Association, Inc. v. Ledar Transp.*, No. 00–0258–CV–W–FJG, 2004 WL 5376211, at *6 (W.D. Mo. Jan. 7, 2004) ("The lease purchase agreements stated that 'during this lease the equipment will be operated exclusively under a lease agreement with Ledar Transport, Inc., a Missouri corporation or such other carrier as may be approved in writing by Lessor.'").

liable because it is an affiliate of AMX, which is a regulated motor carrier.  (Doc. No. 61 at 12-18.)  The Court finds that questions of fact exist regarding whether GLC is an affiliate of AMX.

Pursuant to 49 C.F.R. § 376.2(e), the written lease required by the Truth-in-Leasing regulations is defined as "[a] contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an *authorized carrier* for use in the regulated transportation of property, in exchange for compensation."  Because GLC is not an authorized carrier, it argues that the lease purchase agreements between it and Plaintiffs are not subject to the Truth-in-Leasing regulations.  (Doc. No. 81 at 5.)  However, courts have held that even though an entity is not an authorized motor carrier, the entity may still be subject to the Truth-in-Leasing regulations if it is an "affiliate" of a motor carrier.  For example, in *Owner-Operator Independent Drivers Ass'n, Inc. v. Arctic Express, Inc.*, the plaintiffs entered into lease purchase agreements with D & A, which was a "non-carrier company engaged in the business of leasing truck tractor units, with the option to purchase, to independent owner-operators."  87 F. Supp. 2d 820, 822 (S.D. Ohio 2000).  After leasing the trucks from D & A, the plaintiffs then entered into another lease agreement with Arctic—a regulated motor carrier—in which the plaintiffs leased their trucks and driver services to Arctic.  *Id.*  Because Arctic and D & A had common ownership and officers, the court held that D & A was affiliated with Arctic such that D &A was subject to the Truth-in-Leasing regulations.  *Id.* at 829; *accord Owner-Operator Independent Drivers Association, Inc. v. Ledar Transp.*, No. 00–0258–CV–W–FJG, 2004 WL 5376211, at *6-7 (W.D. Mo. Jan. 7, 2004) (holding motor carrier and leasing company were affiliated because they had the same owners, officers, and directors).

In so holding, the courts in both *Arctic* and *Ledar* relied on an opinion by the Interstate Commerce Commission ("Commission"), in which the Commission concluded that although a motor

79

carrier and leasing company were distinct legal entities, they were affiliated based on their common ownership and the existence of some common officers. *Dart Transit Co.*, 9 I.C.C.2d 701, 702 n.3 (1993). The Commission held this affiliation was "sufficient to trigger the disclosure requirements of § 1057.12(i) (second sentence) in order for Dart (the carrier lessee) lawfully to deduct from lessors' compensation rental payments for Highway (the third party beneficiary)," noting that the relevant regulation was "intended to prevent abuses or the potential for abuse occasioned by collusion between a carrier and the third-party beneficiary of an equipment purchase deduction." *Id.* at 707-08.

Here, there is clearly sufficient evidence to raise a question of fact as to AMX's and GLC's affiliation starting in 2015. At that time, Gurai, the sole member of GLC, also became a partial shareholder of AMX. (Doc. No. 72-1 at 76:5-9.) At that time, Dhillon, Gurai, and Cain also started to meet on a weekly basis to discuss the business. (*Id.* at 149:8-151:5.) Evidence of this type of shared ownership and control is sufficient to create a question of fact as to whether AMX and GLC were affiliated companies from 2015 forward.

Prior to 2015, AMX and GLC did not technically share any owners or officers. Nonetheless, there is evidence that GLC was formed specifically to purchase trucks from AMX and then lease them back to AMX, as Dhillon stated in his declaration that he "needed to sell the trucks to someone who was loyal" to him. (Doc. No. 75-1 at ¶ 36.) In addition, after GLC's formation, there is evidence that the two companies and their employees often acted interchangeably, as prior to becoming a part owner of AMX, Gurai was a signatory on AMX's bank accounts (Doc. No. 61-88), AMX's general manager, Cain, was a signatory on GLC's bank accounts (Doc. Nos. 86-16, 86-17, 86-18), Cain and other AMX employees signed documents on behalf of GLC on multiple occasions (Doc. No. 61-39 at 9; Doc. Nos. 61-90, 61-91; Doc. No. 65-1 at 194:15-196:25; Doc. No. 73-1 at 291:17-292:10),

Parmjit, Gurai's wife, who was responsible for keeping track of payments to GLC drivers, also worked in AMX's billing department (Doc. No. 63-1 at 15:7-9), GLC relied on AMX to find and hire drivers (Doc. No. 73-1 at 167:22-24; Doc. No. 65-1 at 98:9-99:9), Plaintiffs negotiated their lease purchase agreements with Cain (Doc. No. 12-1 at 120:9-23, 193:19-194:4; Doc. No. 13-1 at 109:18-110:8), and an AMX employee assisted Parmjit in preparing Plaintiffs' settlement statements under their lease purchases (Doc. No. 62-1 at 57:3-60:12, 81:4-84:14).  Based on this evidence, there is at least a question of fact as to whether GLC was an affiliate of AMX such that it was subject to the Truth-in-Leasing regulations prior to 2015 as well.  Therefore, GLC is not entitled to summary judgment because of its status as a non-carrier.

Next, AMX and GLC argue that they are entitled to summary judgment because Plaintiffs have not established any provable damages.  (Doc. No. 81 at 14-17.)  The Court disagrees. 49 U.S.C. § 14704(a)(2) provides that "[a] carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part."  Though it appears that the Sixth Circuit has not directly addressed this provision, "other circuits require plaintiffs to prove actual damages." *Davis v. Colonial Freight Sys., Inc.*, No. 3:16-CV-674, 2018 WL 11225871, at *9 (E.D. Tenn. Mar. 2, 2018); *see, e.g.*, *Owner-Operator Independent Drivers Ass'n, Inc. v. Swift Transp. Co. Inc.*, 632 F.3d 1111, 1122 (9th Cir. 2011) ("Each court that has addressed the issue, including our own, has agreed that the statute requires proof of actual damages."); *Owner-Operator Independent Drivers Ass'n, Inc. v. Landstar Sys. Inc.*, 622 F.3d 1307, 1325 (11th Cir. 2010) ("Those courts that have

81

considered this issue have reached the conclusion that § 14704(a)(2) requires evidence of actual damages.").[12]

Although Defendants contend that Plaintiffs cannot prove any actual damages because they were paid correctly according to the lease purchase agreements at issue, the Court finds that a genuine issue of fact exists with regard to that question.  First, as discussed above, neither parties' expert's conclusion with respect to whether Plaintiffs were overcharged or not properly charged with respect to repair expenses was reliable and excluded from the Court's consideration.  Thus, there is a question of fact as to whether deductions were properly taken from Plaintiffs' pay, which would result in actual damages if Plaintiffs were overcharged.  *See* 49 C.F.R. § 376.12(h) ("The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed.").  In addition, even crediting Defendants' expert's conclusions, Grassi concluded that Goodwin had earned approximately $9,000 above expenses in credit toward the purchase of Unit 155.  (Doc. No. 76-2 at 6.)  Yet, Goodwin was not returned any of his escrow fund.  *See* 49 C.F.R. § 376.12(k)(6) ("The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.").

The parties also agree that detrimental reliance may be sufficient to establish actual damages, analogous to a showing of damages based on a violation of the Truth in Lending Act, which similarly requires certain disclosures prior to contracting.  *See United States v. Petroff-Kline*, 557 F.3d 285,

---

[12] Plaintiffs contend they are entitled to recover all deductions from their pay as damages, citing two out-of-circuit cases that adopted this approach. *See Brinker v. Namcheck*, 577 F. Supp. 2d 1052, 1063 (W.D. Wis. 2008); *Bonkowski*, 2004 WL 524723, at *3.  The Court finds these cases unpersuasive, given the strength of authority holding that actual damages are required.

297 (6th Cir. 2009) ("To establish detrimental reliance, the debtor must demonstrate that he or she would either have received a better interest rate for the loans elsewhere or would have elected not to take the loan had the required information been available.").  The Court agrees with Plaintiffs that it is highly questionable whether they would have entered into their respective lease purchase agreements had a written lease been presented as required by the Truth-in-Leasing regulations, which may have alerted Plaintiffs to the possibility of large deductions from their pay occurring without them ever obtaining title to their trucks.  Thus, having considered each of AMX's and GLC's arguments, the Court finds that they are not entitled to summary judgment.

Finally, however, the Court concludes that summary judgment is warranted in favor of IFG and the individual Defendants with respect to Count Fourteen.  As noted above, these Defendants are not liable based on a joint venture theory or under a veil piercing theory.  Plaintiffs' only theory of liability with respect to IFG and the individual Defendants is that they personally participated in any violation.  However, there is no allegations that IFG was in any way involved in Plaintiffs' lease purchases.  Thus, summary judgment in favor of IFG on Count Fourteen is warranted.  With respect to the individual Defendants, there is some support that corporate officers may be held liable if they personally participate in statutory violations.  *See State ex rel. Cordray*, 2016 WL 5408651, at *4-5. However, "[c]ases involving statutory violations have additional support beyond the personal participation theory of liability: the language of the statute applies to the individual who violates the statute and to a corporation."  *Id.* at *5.  Here, Plaintiffs have not cited to any Truth-in-Leasing regulations that would support holding officers or employees directly liable for violations, as the regulations at issue specifically apply to authorized carriers.  *See* 49 C.F.R. §§ 376.11, 376.12.  Thus,

the Court finds summary judgment warranted in favor of the individual Defendants on Count Fourteen.

Accordingly, genuine disputes of material fact exist that preclude granting Plaintiffs' Motion for Partial Summary Judgment and summary judgment in favor of either AMX or GLC. However, summary judgment is warranted as to Count Fourteen in favor of IFG and the individual Defendants.

## IV.    Conclusion

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 61) is DENIED, Defendants' Omnibus Motion for Summary Judgment (Doc. No. 75) is GRANTED IN PART and DENIED IN PART, GLC's Motion for Summary Judgment (Doc. No. 76) is GRANTED IN PART and DENIED IN PART, Defendants' Motion to Strike Ickert Report (Doc. No. 79) is GRANTED IN PART and DENIED IN PART, Defendants' Motion to Strike Brady Report (Doc. No. 80) is GRANTED IN PART and DENIED IN PART, and Plaintiffs' Motion to Exclude Grassi Testimony (Doc. No. 95) is GRANTED IN PART and DENIED IN PART.

In sum, in accordance with the above, the following claims remain: (1) Plaintiffs' claims for breach of contract under Count One against AMX and GLC; (2) Plaintiffs' claims for fraud under Count Four against AMX; (3) King's claim for conversion under Count Five against AMX and GLC; and (4) Plaintiffs' claims for violations of the Truth-in-Leasing regulations under Count Fourteen against AMX and GLC.  All claims against IFG, Dhillon, Gurai, Cain, and Kyle are dismissed.

**IT IS SO ORDERED.**

 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  March 5, 2021                                U. S. DISTRICT JUDGE